**GENERAL MOTORS CORPORATION and Allison Engine Company, Inc., Appellants–Plaintiffs,**

v.

**NORTHROP CORPORATION, Northrop Aircraft Division, Appellees–Defendants.**

No. 49A02–9603–CV–146.

Court of Appeals of Indiana.

Sept. 12, 1997.

Rehearing Denied Oct. 27, 1997.

---

John Lloyd Rice, Scott E. Pickens, Jeffrey A. Green, Miller & Chevalier, Chartered, Washington, DC, Terrill D. Albright, Brent D. Taylor, Baker & Daniels, Indianapolis, for Appellants–Plaintiffs.

Joseph F. Coyne, Jr., Sheppard Mullin, Richter & Hampton, Los Angeles, CA, Douglas B. King, Wooden, McLaughlin & Sterner, Indianapolis, for Appellees–Defendants.

### OPINION

SULLIVAN, Judge.

Appellants, General Motors Corporation (GM) and Allison Engine Company, Inc. (Allison)[1] appeal the trial court's order granting summary judgment in favor of the appellees, Northrop Corporation and Northrop Aircraft Division (Northrop). The litigation involves a contract for production of a tactical fighter aircraft component. Allison's complaint, insofar as germane to this appeal, sought recovery for increased costs attributable to

changes in the contract, recovery for Northrop's failure to disclose superior knowledge, rescission of the contract premised upon misrepresentations and non-disclosure of material facts, and breach of implied warranty as to the specifications for design and manufacture provided by Northrop.

We affirm in part, reverse in part and remand to the trial court.

The facts of this case are extensive and complicated. This action began with the United States Air Force who, in 1986, chose Northrop and Lockheed Aircraft Company (Lockheed) to build the Air Force's new Advanced Tactical Fighter (ATF) aircraft. Both Lockheed and Northrop were to build two ATF prototypes. The ATFs and their design were to be analyzed by the Air Force, and the company whose aircraft was judged, overall, to be more satisfactory would be awarded all future ATF work. Simultaneously, the Air Force was holding a similar competition between General Electric Corporation (GE) and Pratt & Whitney (P & W) for design of the ATF's engines. Each company would also develop two engines, one to be installed in each of the two aircraft.

The design of Northrop's stealth aircraft was unique in that the aircraft's engines were embedded within the ATF's body. Utilizing this design, the engine's high-temperature exhaust, around 4000 degrees, would flow in a channel over the rear deck of the aircraft, thus reducing radar and infrared observability. A key to the success of the design was the development of an engine exhaust liner (EEL), which is an insulating structure that would allow the aircraft to withstand the heat produced by the ATF's engines.

In mid–1987, Northrop at first contracted with P & W and GE in order to do some design work on the EELs. However, Northrop subsequently felt that it may be better served subcontracting the EEL development work because the engine companies may have been too consumed with the engine competition. On August 17, 1987, Northrop

1. Allison was formerly a division of General Motors; therefore, we refer to the original Plaintiff as Allison throughout the opinion.

issued requests for proposals (RFP) to Allison and Rohr Industries, Inc (Rohr)[2]. This request incorporated product function specification (PFS) and statement of work (SOW) information about the liner environment and work to be performed developing the EEL. The RFP explained that the parties were to submit firm fixed prices for the development of the EEL and any questions regarding errors, ambiguities or inconsistencies in the RFP should be brought to Northrop's attention immediately. Northrop also provided Allison and Rohr with the PFS and SOW. None of the documents included any pressure/shock data nor did either company note the need for such data. Allison and Rohr had nine days to review the data and submit a proposal.

Rohr submitted a proposal to Northrop priced at $4 million, and Allison submitted a proposal priced at over $13 million. Northrop evaluated the two proposals and accepted the Allison bid, finding that Rohr's proposal was "technically unacceptable." Record at 7085. The Rohr proposal called for a liner weighing 308 pounds, which was over twice the weight of the liner proposed by Allison.[3]

Northrop and Allison entered into negotiations for development of the EEL. Although Allison had originally proposed a contract with a repricing option, it agreed to develop the EEL at a firm fixed price, regardless of which final design was chosen for the EEL. The contract between Northrop and Allison also contained numerous provisions requiring Allison to provide notice to Northrop of any changes in the scope of the work. The most significant of these provisions incorporated Federal Acquisition Regulation (FAR) 52.249–7, a notification of changes requirement, into the contract.

Allison asserts that Northrop was in the best position to accurately predict the engine exhaust conditions that the liner would have to meet and that Northrop had generated voluminous test data regarding those test conditions which was unavailable to Allison. Allison also asserts that the information

which Northrop provided was incomplete and misleading. In fact, according to Allison, Northrop had conducted years of simulations and tests in conjunction with the government, generating extensive data critical to the design and pricing of the EEL. However, Allison claims that when it described an original plan for design of the liner to Northrop in August of 1987, albeit before Allison submitted a bid for the project, Northrop did not inform Allison that it had test data indicating that Allison's perception of the liner environment was wrong.

On October 29, 1987, Allison personnel attended a meeting with GE representatives to discuss the EEL. A GE engineer showed Allison a chart which appeared to be based upon Northrop test data. The chart indicated to Allison that the liner environment would be significantly different than had been indicated by Northrop, and Allison engineers knew that the information would force Allison to develop a heavier and more expensive liner design.

After seeing the chart, Allison immediately asked Northrop for all of the relevant data, emphasizing the importance of the information and the fact that this was a potentially catastrophic situation. Northrop responded a few days later by providing Allison with a few charts, but they contained only a fraction of the information which Allison required. The new information, however, did indicate that Northrop's original specifications were in error and that the GE chart was accurate. Allison continued to pressure Northrop for information, and its understanding of the EEL environment gradually increased. Finally, Allison began to develop a new liner concept, known as a honeycomb-tile design, in order to accommodate the newly-discovered environment. Never, however, did Allison provide Northrop with a written notification of changes in the scope of the contract as required by FAR 52.249–7.

Northrop asserts that the charts which Allison saw at GE were not significant to Allison because of the fact that they showed the pressure levels that the EEL would ex-

2. GE had previously contacted Rohr as a potential subcontractor on its EEL work.

3. The final Allison EEL weighed more than Rohr's initial proposal.

perience but that the charts indicated that the EEL might be operated in over expanded or under expanded conditions. According to Northrop, Allison believed that this expansion could cause high pressure/shock levels in excess of those that Allison had assumed based upon P & W data.[4] Northrop further asserts that Rohr's engineers, as well as the P & W engineers with whom Allison met, testified that they knew that the ATF engines would operate in such conditions. Finally, Northrop asserts that all supersonic jet engines operate in over and under expanded conditions and therefore have pressure/shock levels in the engine exhaust stream.

This suit ensued in September of 1991. On June 20, 1995, the trial court entered the first of many entries regarding Northrop's various motions for summary judgment. The trial court denied Northrop's motions upon all of the counts with the exception of count five which was a claim against Northrop seeking rescission of the contract. The court reasoned that rescission was not available to Allison because it kept working on the project after it knew about the potential cost for overruns. Upon Northrop's motion to reconsider, the trial court granted summary judgment in favor of Northrop as to the remaining counts.

### I

#### Summary Judgment Standard of Review

■ When reviewing a decision upon a motion for summary judgment, this court applies the same standard as the trial court: summary judgment shall be granted if the designated evidentiary material demonstrates that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C); *Wickey v. Sparks* (1994) Ind.App., 642 N.E.2d 262, *trans. denied*. A genuine issue of material fact exists where facts concerning an issue which would dispose of litigation are in dispute. *Kerr v. Carlos* (1991) Ind.App., 582 N.E.2d 860, *overruled on other grounds, Kennedy v. Murphy* (1995) Ind., 659 N.E.2d 506. In other words,

for summary judgment purposes, a fact is "material" if it is necessary to facilitate resolution of any issue. *Board of Comm'rs of Steuben County v. Angulo* (1995) Ind.App., 655 N.E.2d 512. All facts and inferences must be liberally construed in favor of the party opposing a motion for summary judgment. *Hendricks County Bank & Trust Co. v. Guthrie Bldg. Materials, Inc.* (1996) Ind. App., 663 N.E.2d 1180. A reviewing court must carefully scrutinize an entry of summary judgment to ensure that the non-prevailing party is not denied his or her day in court. *Schrum v. Moskaluk* (1995) Ind.App., 655 N.E.2d 561, *trans. denied*. Thus, even if the trial court believes that the non-moving party will not prevail at trial, summary judgment may not be entered where material facts conflict or conflicting inferences arise from undisputed facts. *Id*. Nevertheless, in order to prevail upon appeal from the entry of summary judgment, the appealing party has the burden to establish the existence of a genuine issue of material fact from materials designated to the trial court. *Thompson v. Murat Shrine Club, Inc.* (1994) Ind.App., 639 N.E.2d 1039, *trans. denied*.

### II

#### Choice of Law

■ An initial question which we must decide, and which has received considerable attention by both parties, concerns the law which should govern this dispute. Northrop has taken the position that the substantive law of California should apply, while Allison favors the application of the federal common law of government contracts. The trial court determined that both California law and the federal common law of government contracts could be used in the construction and interpretation of the contract, but that if a conflict between the two bodies of law occurred, the contract dictated that California law should prevail.

The Master Agreement entered into by the parties provides, at paragraph 9, that "[t]his agreement shall be interpreted in accordance with the procedural and substantive law of

---

**4.** Northrop asserts that Allison was actually relying on discussions it had with P & W and erroneously believed that the pressure would not exceed 14.7 ± 3 psi.

California." Record at 2013. Included within the Master Agreement is a portion of the contract entitled "Purchase Order." Paragraph 19(B) of the Purchase Order Terms and Conditions, incorporated by reference into the Master Agreement by paragraph 3 of the Master Agreement, states the following:

> Choice of Law. Irrespective of the place of performance, this Order will be construed and interpreted according to the federal common law of government contracts as enunciated and applied by federal judicial bodies, boards of contract appeals, and quasi-judicial agencies of the federal government. To the extent that the federal common law of government contracts is not dispositive, the laws of the State of California shall apply.

Record at 2033.

The incorporated Purchase Order Terms and Conditions contains an Order of Precedence provision which provides:

> In the event of any inconsistency between any provisions, attachments, documents or exhibits of this subcontract,[5] the inconsistency shall be resolved by giving precedence in the following order:
>
> A. Purchase order and delivery schedule
> B. Terms and conditions
> C. Statement of work
> D. Procurement specifications
> E. SDRL and DIDs
> F. Other applicable documents and exhibits
>
> All noted documents include documents attached thereto or incorporated therein by reference unless otherwise stated. Typed provisions shall prevail over provisions incorporated by reference.

Record at 2043.

It is important to note that the first choice of law provision applies to the entire agreement, including the purchase order. The second choice of law provision, found at paragraph 19(B) of the purchase order, states that "this Order will be interpreted and construed...." That provision only applies to the purchase order. Neither section explains how conflicts in the contract will be resolved. They only direct the court to apply a body of law in order to interpret or construe the portions of the contract to which they apply. That is, the first portion tells us to interpret the entire contract according to California law. The second provision tells us to apply federal law, in as far as it is dispositive, to the provisions within the purchase order portion of the contract. Because there is some overlap, the first provision applies to the entire contract, including the purchase order terms. The choice of law provision tells us that the purchase order provisions take precedence; therefore, the choice of law provision at paragraph 19(B) applies to the terms within the purchase order.

 Northrop claims that since the two choice of law provisions select different bodies of applicable law, they are inconsistent. Northrop therefore contends that this inconsistency must by resolved through the Order of Precedence provision. According to Northrop, under the Order of Precedence scheme, the provision selecting California law takes precedence over the provision selecting federal law. Northrop's interpretation of the choice of law and Order of Precedence provisions assumes that the choice of law provisions are necessarily in conflict and would render the provision selecting federal law meaningless. However, it is unlikely that the parties would select both choice of law provisions with the intention that one would be entirely written out of the contract in this way. The primary purpose in the construction of contracts is to ascertain and give effect to the mutual intention of the parties. *Hutchinson, Shockey, Erley & Co. v. Evansville–Vanderburgh County Bldg. Authority* (1994) Ind., 644 N.E.2d 1228, *reh'g denied.* In seeking to discover and implement the intent of the contracting parties, we favor interpretations which harmonize provisions, rather than those which cause terms to be in conflict. *Boswell Grain and Elevator, Inc. v. Kentland Elevator and Supply, Inc.* (1992) Ind.App., 593 N.E.2d 1224. Further, a court must make every effort to avoid a construc-

---

5. The term "subcontract" is apparently a reference to the entire agreement, not merely the purchase order, because this is a government subcontract.

tion of contractual language which renders any words, phrases, or terms ineffective or meaningless. *Bicknell Minerals, Inc. v. Tilly* (1991) Ind.App., 570 N.E.2d 1307, *reh'g denied.*

A more reasonable interpretation, which would harmonize both choice of law provisions and render neither provision meaningless, is that the parties intended that California law should govern interpretation of the more general contract terms contained in the Master Agreement, and that federal law should apply to the more specialized terms such as the numerous FARs contained in the incorporated Purchase Order Terms and Conditions. This interpretation is born out by both the language and location of the respective choice of law provisions. The provision selecting California law is found in the portion of the contract entitled "Master Agreement" and applies by its terms to the "agreement." Record at 2013. The provision selecting the federal common law of government contracts, however, is found in the Purchase Order Terms and Conditions along with the FAR provisions, and applies to the "Order." Record at 2033. Because the FAR is one of the "Terms and Conditions" of the "Purchase Order", it is reasonable to assume that the parties intended it to be construed according to the choice of law specifically applicable to the "order", and which is contained within the same section of the contract, that being the purchase order.

The parties' intent in this regard is further confirmed in light of the fact that when parties incorporate a federal regulation such as the FAR into a contract, they typically intend to incorporate the body of judicial interpretation accompanying the regulation. For example, in *Westinghouse Elec. Corp. v. Garrett Corp.* (1977) D.Md., 437 F.Supp. 1301, *aff'd*, (1979) 4th Cir., 601 F.2d 155, the court noted that despite a contract clause selecting state law to govern contract interpretation, federal law should be consulted with respect to the interpretation of standard government procurement regulations incorporated into the contract. As the court stated,

> [t]hese clauses have long been used in Government contracts and have a considerable administrative and judicial gloss. Where the parties to a contract adopt a standard and oft-construed clause, it is only logical that their intent is also to adopt the gloss thereon. The meaning of standard language is inseparable from its prior interpretation.

*Id.* at 1329. More recently, the court in *Linan–Faye Const. Co. v. Housing Auth. of Camden* (1995) 3rd Cir., 49 F.3d 915, approvingly quoted the lower court's recognition that state courts would understand that " 'where the parties have incorporated a particular clause pursuant to federal regulation, they do so against the backdrop of federal case law addressing the clause.' " *Id.* at 922 (quoting *Linan–Faye Const. Co. v. Housing Auth. of Camden* (1994) D.N.J., 847 F.Supp. 1191, 1197). The court therefore concluded that state courts generally "would look to this rich body of federal common law concerning" interpretation of the incorporated federal regulation. *Id.*

Thus, we believe that the parties intended that federal law should govern the construction of the FAR provision. Our interpretation furthers the apparent intent of the parties while harmonizing the provisions and avoiding an interpretation which would cause the choice of law provisions to be in conflict.

The same analysis does not apply, however, to Allison's remaining theories of recovery. Both choice of law provisions purport to select the law to be applied in "construing" and "interpreting" the written contract. The terms "construction" and "interpretation" refer to the process of ascertaining the meaning of written documents. The only claims which appear to require an interpretation or construction of the language of the contract are those which relate to the effect of the Notification of Changes requirement incorporated into the contract from FAR 52.243–7. Allison's other claims, which are that Northrop breached the contract by failing to disclose superior knowledge, that the contract should be rescinded because Northrop induced the agreement through misrepresentation and non-disclosure of material facts, and that Northrop breached an implied warranty of the correctness of Northrop's specifications, are extra-contractual common law causes of action

sounding in contract. These claims do not require an ascertainment of the meaning of the contract's language. It might be argued that the choice of law clauses should not be limited to situations involving contract interpretation and construction. However, the contract does not include language to the effect that one or the other body of law will apply to govern all disputes arising under the contract. Courts do not have the power to create for the parties a contract which they did not make, nor to insert language into a contract which was not inserted by the parties, *Wright Motors, Inc. v. Marathon Oil Co.* (1994) Ind.App., 631 N.E.2d 923, and we will not undertake to rewrite the parties' contract to include such a clause. We must therefore determine which law should apply to govern Allison's common law causes of action.

 Since the contract did not expressly select a particular body of law to govern these disputes, under governing Indiana principles, the state in which Allison's action was brought, must determine the applicable law. As noted above, Allison's remaining claims are common law causes of action sounding in contract. Contractual disputes brought in Indiana courts are governed by the law of the forum with the most intimate contacts with the facts. *OVRS Acquisition Corp. v. Community Health Services* (1995) Ind.App., 657 N.E.2d 117, *trans. denied.* Among the factors that we consider when determining which forum has the most intimate contacts with the facts are the place where the contract was negotiated and entered into, the place the contract was performed, the location of the contract's subject matter, and the residence and place of business of the parties. *Id.*

The record reveals that the contract was negotiated and entered into in California on September 3 and 4, 1987. Allison is an Indiana corporation and performed its work developing the engine exhaust liner in Indiana. Northrop's home is in California, and it was in that state that the ATF into which Allison's liner was to be incorporated was developed and manufactured. While California does not appear to have overwhelmingly more intimate contacts with the

facts than Indiana, we believe that California law should control. California is the place in which the parties negotiated the terms of the contract. The parties entered into the contract in California. While Allison's work on the liner was performed in Indiana, the entire ATF program, of which the liner project was a mere component, was located in California. And, not insignificantly, the parties did choose California law at least with respect to contract interpretation and construction. There is no indication whatsoever that the parties ever contemplated the possibility that the law of Indiana would apply to this dispute. We therefore conclude that the law of California must govern the resolution of Allison's common law causes of action.

### III

#### Components of Allison's Complaint

##### A. *Federal Acquisition Regulation 52.243-7*

 Under count four of Allison's amended complaint, Allison asserted that it had entered into a valid contract with Northrop for production of the EEL. However, Allison claims that Northrop participated in conduct that "drastically added to, modified, and changed the scope of work as contemplated under the contract." Record at 293. Northrop moved for summary judgment claiming that Allison had failed to adhere to various "changes provisions" within the contract. The trial court denied Northrop's motion noting that one of the changes provisions did not seem to apply to the change at hand and that the evidence showed that Northrop may well have been aware of the changes made and that was a question of fact inappropriate for a summary judgment determination.

Upon a motion for reconsideration, the trial court reversed itself. Northrop brought to the court's attention another notification of changes provision, the aforementioned FAR 52.243-7. The court noted that this provision allowed for an equitable adjustment in the contract price if Allison notified Northrop, in writing, of those actions by Northrop which necessitated a change in the scope of the contract. The court found that Allison had not provided written notice as required by

the provision, and thus, Allison was barred from any equitable adjustment.

The federal acquisition regulation in question here reads, in relevant part, as follows:

(b) *Notice.* The primary purpose of this clause is to obtain prompt reporting of [Northrop] conduct that [Allison] considers to constitute a change to this contract. Except for changes identified as such in writing and signed by the Contracting Officer, [Allison] shall notify the Administrative Contracting Officer in writing promptly, within [thirty days] from the date that [Allison] identifies any [Northrop] conduct (including actions, inactions, and written or oral communications) that [Allison] regards as a change to the contract terms and conditions....

. . . .

(e) *Equitable adjustments.* (1) If the Contracting Officer confirms that [Northrop] conduct effected a change as alleged by [Allison], and the conduct causes an increase or decrease in [Allison's] cost of, or the time required for, performance of any part of the work under this contract, whether changed or not changed by such conduct, an equitable adjustment shall be made—

(i) In the contract price or delivery schedule or both; and

(ii) In such other provisions of the contract as may be affected.

(2) The contract shall be modified in writing accordingly. In the case of drawings, designs or specifications which are defective and for which [Northrop] is responsible, the equitable adjustment shall include the cost and time extension for delay reasonably incurred by [Allison] in attempting to comply with the defective drawings, designs or specifications before [Allison] identified or reasonably should have identified, such defect.... The equitable adjustment shall not include increased costs or time extensions for delay resulting from [Allison's] failure to provide notice or to continue performance as provided, respectively, in (b) and (c) above.

FAR 52.243–7.

The trial court found that Allison had no right to an equitable adjustment because it had failed to provide Northrop with *written* notice of what Allison considers a change in the contract conditions. Furthermore, the trial court noted that the language at the end of the FAR under (2) "specifically states that an equitable adjustment shall not include increased costs resulting from the contractor's failure to provide notice, i.e., when a contractor fails to give notice any work he performs thereafter he performs at his own peril". Record at 3701–02.

As noted above, federal law controls our interpretation of the FAR provision. In *H.H.O. Co. v. United States* (1987) 12 Cl.Ct. 147, the United States Claims Court faced a similar situation. In that case, the contractor, pursuant to the claims clauses in the contract, had to give written notice of a claim within specified time periods if it were to be allowed to proceed in attaining an equitable adjustment. Similar to the FAR provision discussed herein, these provisions required the government's contracting officer to evaluate those claims. H.H.O. submitted untimely notice of its claims to the government. The contracting officer proceeded to evaluate some claims, while noting the untimeliness of the notice, and simply dismissed others because written notice of them was untimely. *Id.* at 164.

In evaluating H.H.O.'s claim, in light of the fact that it did not deny its failure to provide written notice of claims until months after the contracts were terminated for default, the court wrote:

The basic question remaining is whether, under the circumstances of these two contracts, the notice requirements of the contract clauses in question can be subordinated to the actual or constructive knowledge by the contracting officer of the facts and events underscoring the claim.... It is settled that a contractor's failure to adhere to the notice requirements of contract clauses can result in claims presented pursuant to said clauses being disallowed. [citations omitted] On the other hand, one should not be technical or illiberal in the "notice" area, as indicated above. [citation omitted]. Defendant's position on the notice question is that failure to give the

written notice required by various contract clauses serves, as a matter of law, to preclude any action based on said clauses. Case law does not support this position. Notice provisions are subject to estoppel by an act of waiver depending on the facts of each case.

... Plaintiff has submitted materials which raise a question as to whether the contracting officer was aware of the operating facts of each of the involved claims and whether his actions should be deemed a waiver of the notice requirements of the various contract clauses. Further, it is not completely clear to the court whether the government was prejudiced, and if so in the manner it was prejudiced. It is the government's burden to establish the fact of prejudice.

*Id.* at 164. *See also, Big Chief Drilling Co. v. U.S.* (1988) 15 Cl.Ct. 295.

In evaluating the purpose of a notice provision in a case where the plaintiff had provided the government with written notice of a *possible* claim but not notice of a claim as provided by the contract, the United States Claims Court pointed out that the notice provision serves two purposes. First, the notice allows the government to:

> see the undisturbed conditions for evaluation purposes, and second, [it allows] the [g]overnment to exercise control over the resolution of the problem.... [P]rimarily[,] the notification requirement is a litigation avoidance mechanism. Its purpose is practical, not punitive. It is a device to stimulate the [g]overnment to take its own investigative action and perhaps corrective measures in conjunction with the contractor. For that reason, notice does not need to be in any specific format; it need only clearly show the existence of the condition.

*Brechan Enterprises v. United States* (1987) 12 Cl.Ct. 545, 549 [citations omitted].

Northrop draws this court's attention to *Santa Fe, Inc.* VABCA No. 1898, 87–1 BCA 19,527 1986 WL 20331. In that case, the board of contract appeals denied appellant's claim based upon the fact that the appellant had failed to provide written notice. The appellant asserted that the government had constructive notice, but the administrative law judge countered that: "[t]here is no evidence that increased costs were raised as a problem at that time, nor do we find that the [g]overnment knew or should have known that a claim would eventually be contemplated by the contractor." *Id.* at 1986 WL 20331, *14. What Northrop does not acknowledge is that the administrative law judge, in making that finding, was making a factual determination. Earlier, the opinion took note of the fact that "this notice provision is satisfied where the [g]overnment was aware or should have been aware of the facts giving rise to the claim." *Id.* at *12. It is not for this court, nor the trial court below upon a motion for summary judgment, to assess whether Northrop was aware of the underlying facts giving rise to the claim in the face of conflicting evidence. *Santa Fe* tacitly accepts that constructive notice may fulfill the requirements of the written notice provision.

As mentioned above, the FAR ends with the language "[t]he equitable adjustment shall not include increased costs ... resulting from [Allison]'s failure to provide notice as provided ... above." FAR 52.243–7. In Allison's brief, it argues that there should be a reduction "in the allowable equitable adjustment for any increased costs that are directly attributable to a lack of notice; [the FAR] does not describe a complete denial of any right to an equitable adjustment." Appellant's Br. at 20. We do not agree fully with Allison's interpretation. The FAR clearly describes a situation in which the contractor has failed to provide notice *as provided above.* The sentence does not contemplate the situation in which no notice has been provided. If Northrop is totally uninformed about the facts giving rise to the change in the scope of the contract or otherwise not told about the change, then we would be inclined to agree with Northrop that this, in and of itself, is prejudice to Northrop. The FAR clearly allows Allison to recover costs when it provides notice in a way other than illustrated in the contract; however, those costs are reduced by the amount, if any, of the costs which are attributable to Allison's failure to provide the clear notice which is delineated in the contract.

Northrop argues that it was prejudiced by Allison's failure to provide written notice. Northrop claims that it had the option to renegotiate the contract with Allison, rebid the contract and award it to someone else [6], or simply perform the work itself. The problem with Northrop's argument is threefold. First, as noted, whether those options existed is a question of fact and should survive summary judgment. Second, Northrop argues that it was prejudiced merely by the fact that it did not have the opportunity to *consider* those options. A careful reading of the FAR does not indicate to this court that Northrop had any of those options even if Allison had provided Northrop with notice. The FAR simply says that if Northrop's "conduct effected a change as alleged by [Allison] ... an equitable adjustment *shall be made*". FAR 52.243-7 (emphasis supplied). Northrop has failed to show that the contract allowed for the exercise of any of the "options." Finally, Northrop has failed to show to this court how its options would be different if Allison had provided written, as opposed to oral, notice. If Northrop did indeed have any of the aforementioned options, it has failed to demonstrate that the same options were not available if indeed it was aware of the change in the scope of the contract. As noted above, it is incumbent upon Northrop to demonstrate prejudice, and it has failed to do so.

### B. Breach of Contract for Failure to Disclose Superior Knowledge

Allison's complaint alleged that Northrop possessed information, through testing conducted by Northrop and others, regarding the environment in which the engine exhaust liner would have to function, including the existence and magnitude of pressure shock structure impingement upon the engine exhaust liner. Allison maintained that this information was essential to estimate the difficulty, time and expense of producing the liner. Allison claimed that, since this information was developed in secrecy, Northrop knew or should have known that Allison could not have obtained the information from another source. Thus, Allison claims, Northrop was under a duty to disclose this information so that Allison could submit a bid which accurately reflected the actual cost of constructing the liner and is therefore liable for damages resulting from its nondisclosure.

Northrop moved for summary judgment solely upon the basis that no such cause of action was available against a non-government defendant under California, federal or Indiana law. The trial court determined that federal law should control here and agreed with Northrop that federal law would not permit Allison to recover against a private defendant under this theory. Since we have concluded that California law should apply, we must determine whether Allison's cause of action may be brought against a private defendant under California law.

Allison's complaint appears to allege all of the essential elements of a cause of action recognized by the California Supreme Court. In *Warner Constr. Corp. v. Los Angeles* (1970) 2 Cal.3d 285, 85 Cal.Rptr. 444, 466 P.2d 996, the court noted that " '[i]t is the general rule that by failing to impart its knowledge of difficulties to be encountered in a project, the owner will be liable for misrepresentation if the contractor is unable to perform according to the contract provisions.' " *Id.* at 449, 466 P.2d at 1001 (quoting *City of Salinas v. Souza & McCue Construction Co.* (1967) 66 Cal.2d 217, 57 Cal.Rptr. 337, 424 P.2d 921, 923). The court stated that this "cause of action for non-disclosure of material facts may arise ... [when] ... the facts are known or accessible only to defendant, and defendant knows they are not known to or reasonably discoverable by the plaintiff...." *Id.*

Northrop claims that this cause of action may only be brought against government defendants. However, cases following *Warner Construction* indicate that this cause of action applies against private defendants. For example, in *Goodman v. Kennedy* (1976) 18 Cal.3d 335, 134 Cal.Rptr. 375, 556 P.2d 737, a case between private parties, the Cali-

---

6. Much is made of the fact that Rohr and Allison bid on the original contract. Northrop asserts that this is evidence that it had other options for a contractor. Allison points to evidence that Rohr's bid was technically unacceptable. Whether any of Northrop's options were, in actuality, viable is clearly a question of fact and thus should survive a motion for summary judgment.

fornia Supreme Court cited *Warner Construction* for the proposition that a "basis for a duty of disclosure ... may exist when one party to a transaction has sole knowledge or access to material facts and knows that such facts are not known to or reasonably discoverable by the other party." *Id.* at 383, 556 P.2d at 745. Further, in *C. Norman Peterson Co. v. Container Corp. of America* (1985) 172 Cal.App.3d 628, 218 Cal.Rptr. 592, the court agreed with the respondent that the appellant breached its contract and consequently caused the contract's abandonment under the theory drawn from *Warner Construction* that "[b]y failing to impart its knowledge of difficulties to be encountered in a project, an owner may be liable for misrepresentation if the contractor is unable to perform according to the contract provisions." *Id.*, 218 Cal.Rptr. at 600.[7] More recently, the court in *LiMandri v. Judkins* (1997) 52 Cal.App.4th 326, 60 Cal.Rptr.2d 539, *rev. denied,* confirmed the existence in California of a cause of action for a breach of duty to disclose facts material to a particular transaction. The court noted that "a duty to disclose [material facts] may arise from the relationship between ... parties entering into any kind of contractual agreement." *Id.*, 60 Cal.Rptr.2d at 543. According to the court, the relationships which give rise to a duty of disclosure are the product of "transactions between parties from which a duty to disclose facts material to the transaction arises under certain circumstances." *Id.* at 543–44.

Thus, in California, a private defendant may be held liable for breaching a duty to disclose facts material to a particular transaction. Further, such material facts may in appropriate cases be thought of as "superior knowledge" of the conditions under which a contract is to be performed. Of course, a duty to disclose material facts will only arise in certain limited circumstances. The cases

cited above indicate that a duty of disclosure on the part of Northrop would only exist if the information regarding the pressure shock environment was known or accessible only to Northrop and if Northrop knew that this information was not known or reasonably accessible to Allison. These are questions of fact about which both parties are in disagreement. Summary judgment is therefore inappropriate at this juncture.

### C. *Rescission for Inducement of Contract through Misrepresentation/Nondisclosure*

■ Allison asserts that the trial court also erred in granting summary judgment in favor of Northrop upon Count Five of its complaint which is based upon inducement to contract by misrepresentation and nondisclosure of material facts. In Allison's amended complaint, it asserts that Northrop induced Allison into entering into a contract based upon false and withheld information. Therefore, Allison elected "to void the contract for the engine exhaust liner and to recover the reasonable value of [its] work." Record at 295.

Northrop moved for summary judgment upon the theory that the California statute of limitations barred Allison's Count Five. Although the trial court found that Indiana, as opposed to California, procedural law was applicable, it still granted summary judgment in Northrop's favor, concluding that the remedy of rescission was not available in this case because of Allison's delay in asserting the claim.

It is clear that, under California law, "[t]o effect a rescission, the rescinding party, upon discovering the facts which entitle [it] to rescission, must promptly give notice of the intent to rescind to the other party to the contract." *In re Hathaway Ranch Partnership,* (1990) Bankr.C.D.Cal., 127 B.R. 859,

---

**7.** Northrop claims that Allison's citation of *C. Norman Peterson Co. v. Container Corp. of America* (1985) 172 Cal.App.3d 628, 218 Cal.Rptr. 592, is a "deception" which is "easily unraveled." Appellee's Br. at 50. The alleged deception is that the above-quoted passage is a recitation of the plaintiff's contention and not the opinion of the court. First, in that opinion, the court simply stated a proposition of law and cited *Warner Construction* as support. There is no indication that this proposition was simply the product of one of the parties' imaginations. Second, in that opinion's following paragraph, the court *agreed* with the party's breach of contract claim, which was based upon the proposition supported by the citation to *Warner Construction. Id.*, 218 Cal.Rptr. at 600.

863 (citing Cal.Civ.Code § 1691). A party cannot be aware of the facts underlying his reason for rescission yet continue to perform under the contract and look to rescission for relief at a later date. However, as Allison points out, the California Civil Code dictates that "[w]hen relief based upon rescission is claimed in an action or proceeding, such relief shall not be denied because of delay in giving notice of rescission unless such delay has been substantially prejudicial to the other party." Cal.Civ.Code § 1693.

The trial court noted that "all parties agree that the information that allegedly was withheld from Plaintiff by Defendant was known to the Plaintiff by the end of 1987, or at the latest by the beginning of 1988." Record at 3539. If Allison had rescinded the contract at that point, it would not have incurred a large portion of the $28 million herein claimed. Allison would seem to be hard pressed to show how this $28 million is not the prejudice which prompt notification of rescission is designed to avoid. Allison, in order to avail itself of the remedy of rescission, must have notified Northrop of its intention to rescind at the time it became aware that the contract was based upon misrepresentations. It cannot continue with the contract, at Northrop's eventual expense, then later void the contract. *See Cutter Laboratories, Inc. v. Twining Co.* (1963) 221 Cal.App.2d 302, 34 Cal.Rptr. 317. The trial court did not err in determining that rescission was not available to Allison in the present case.

## D. *Breach of Implied Warranty of Correctness of Specifications*

Allison claimed that Northrop's specifications were incorrect and misleading due to the alleged failure to disclose information regarding pressure shock impingement on the liner. The misleading and incorrect nature of the specifications, according to Allison, caused it to submit a bid which did not accurately reflect the true cost of developing and manufacturing the liner. According to Allison, Northrop's specifications came with an implied warranty of correctness, and their allegedly defective nature constituted a breach of this warranty. As with the "supe-

rior knowledge" claim, Northrop contended that this cause of action could only be brought against a public defendant, and the trial court agreed.

Allison has clearly alleged the elements of a cause of action which may be brought against a private defendant in California. In *MacIsaac and Menke Co. v. Cardox Corp.* (1961) 193 Cal.App.2d 661, 14 Cal.Rptr. 523, a private subcontractor agreed to install a fire protection system for a private general contractor pursuant to the specification that the equipment would be installed overhead. However, much of the equipment had to be placed in pipe trenches, which led to an increase in the cost of performance. The California Court of Appeals determined that the subcontractor was entitled to recover the extra costs engendered by the general contractor's incorrect specifications. The court stated that:

> [a]s a general proposition, it is well recognized that where plans and specifications induce a contractor to reasonably believe that certain indicated conditions actually exist and may be relied upon in submitting a bid, the contractor is entitled to recover the value of such extra work made necessary by the existence of different conditions.

*Id.,* 14 Cal.Rptr. at 528. Further, in *Coleman Engineering Co. v. North American Aviation, Inc.* (1966) 65 Cal.2d 396, 55 Cal. Rptr. 1, 420 P.2d 713, the California Supreme Court applied the above rule in a case between private parties. While a recitation of the court's paraphrasing of the above rule may seem redundant, we repeat it here for the sake of clarity and to aid the trial court as it attempts to apply the rule:

> [a] contractor who, acting reasonably, is misled by incorrect plans and specifications issued by another contracting party as the basis for bids and who, as a result, submits a bid which is lower than he would otherwise have made may recover in a contract action for extra work necessitated by the incorrect plans and specifications.

*Id.* at 7, 420 P.2d at 719. Moreover, the court in *C. Norman Peterson Co., supra,* 172 Cal.App.3d 628, 218 Cal.Rptr. 592, concluded that one party had breached its contract by

furnishing erroneous plans, stating "[t]he furnishing of misleading plans and specifications by an owner is a breach of an implied warranty of their correctness." *Id.* at 600.

California law thus permits, under certain circumstances, one party to a contract to recover additional expenses arising from its reasonable reliance upon defective specifications provided by a private party. In order to recover for extra work necessitated by incorrect specifications under this theory, Allison must demonstrate that (1) it reasonably relied upon, or was reasonably misled by, Northrop's specifications; (2) Northrop's specifications were incorrect; and (3) Allison submitted a bid which was lower than it would have if the specifications were accurate. These are all questions of fact which preclude the entry of summary judgment upon this count.

### E. *Affidavits of Junod and Daniluck*

When the trial court granted summary judgment on July 18, 1995, in favor of Northrop upon its motion to reconsider, Allison moved the court to reconsider that order. In support of its motion to reconsider, Allison filed affidavits of John Daniluck, Larry Junod and John Cibinic, Jr. Northrop filed a motion to strike the affidavits. The trial court found that the Daniluck affidavit should be stricken because "most portions of the affidavit are irrelevant as to the issues here under consideration, and that the portions that might be relevant are based upon hearsay, i.e., statements with respect to meetings which occurred where Mr. Daniluck was not in attendance." Record at 11,082. The court also struck the affidavit of Junod, save paragraphs 17 through 24, upon the basis that it was irrelevant. The court also struck portions of the Cibinic affidavit; however, Allison does not take issue with the trial court's decision regarding this affidavit upon appeal.

While Indiana Rule of Evidence 402 tells us that all relevant evidence is admissible, Rule 401 points out that " '[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ind.R.Evid.

401. Northrop's assertion is that the trial court did not err because the substance of the affidavits was not actually relevant to the action before the court upon Allison's motion to reconsider.

As heretofore stated, the trial court granted summary judgment on behalf of Northrop based upon the premise that Allison's causes of action did not exist under the relevant case law or that Allison was required to provide written notice to Northrop in order to maintain an action under the contract. The only factual determination necessary to the trial court's determination was whether Allison had, in fact, provided written notice to Northrop, which Allison, admittedly, did not. Nothing in the affidavits presented by Allison with its motion is relevant to that factual determination. The affidavits are primarily focused upon Allison's assertion that Northrop was fully aware of the facts underlying the change in the scope of the contract and that Allison kept Northrop apprised of those facts. While these affidavits will clearly be admissible before the trial court upon remand when it faces the difficult task of ascertaining whether Northrop was made aware of those facts, we cannot say that the trial court erred when determining that those affidavits were inadmissable for determination of the action before it upon the motion for reconsideration. Because we affirm the trial court's ruling upon the fact that the affidavits were irrelevant to the action before the court upon Allison's motion for reconsideration, we need not address whether portions of those affidavits constituted hearsay.

### F. *Denial of Allison's Motion to File Second Amended Complaint*

On September 29, 1995, over four years after Allison filed its initial complaint and nearly two years after Allison filed its first amended complaint, Allison moved for leave to file a second amended complaint. The new complaint sought to add two counts, one count of fraud under California law and one count of constructive fraud under Indiana law. On February 1, 1996, the trial court denied Allison's motion based upon the fact that there was no justification for Allison's delay in adding these claims, that Nor-

throp would be prejudiced by the delay, and that allowing Allison to amend the complaint would be futile.

Allison filed a 33–page brief[8] on July 16, 1996 dedicated solely to the issue of whether the trial court erred in denying its motion. The brief was consolidated with the present case, and Northrop dedicated 26 pages of its response brief to this issue. We, however, find the issue less complicated than do the parties.

▉ "Amendments to the pleadings are to be liberally allowed in order that all issues involved in a lawsuit are presented to the jury." *Mullen v. Cogdell* (1994) Ind. App., 643 N.E.2d 390, 399, *trans. denied* (citing *Allied Mills, Inc. v. P.I.G., Inc.* (1983) Ind.App., 454 N.E.2d 1240). However, "[t]he trial court has broad discretion in granting or denying amendments to the pleadings and we will reverse only upon a showing of abuse of discretion." *Id.; See also, Freedom Express, Inc. v. Merchandise Warehouse Co., Inc.* (1995) Ind.App., 647 N.E.2d 648; *Brenneman Mechanical v. First Nat. Bank* (1986) Ind.App., 495 N.E.2d 233, *trans. denied; B & D Corp. v. Anderson, Clayton & Co.* (1979) 180 Ind.App. 115, 387 N.E.2d 476. "An abuse of discretion is an erroneous conclusion and judgment, clearly against the logic and effect of the facts and circumstances before the court or the reasonable deductions to be drawn therefrom." *Freedom Express, supra,* 647 N.E.2d at 653.

▉ Trial Rule 15(A) provides that a complaint may be amended by leave of the trial court and that the trial court should grant such leave "when justice so requires." Ind.T.R. 15(A). In *Palacios v. Kline* (1991) Ind.App., 566 N.E.2d 573, this court articulated several factors to which a trial court should look in determining whether justice requires the leave be granted. Those factors include undue delay, bad faith, or dilatory motive on the part of the movant and undue prejudice to the opposing party. *Id.* at 575. The trial court noted that Allison asserted the claims for four years after its original complaint and almost two years after its first amended complaint. It was reasonable to assume that such delay is undue. The court further noted that Allison did not assert that it had discovered new evidence which might justify the delay.[9] Given the deference required to be given to the trial court, we cannot say that there was an abuse of discretion.

## IV

### Conclusion

In conclusion, we hold that the trial court erroneously granted summary judgment as to counts three, four and six. Both count three and count six allege causes of action which under California law may be brought against private defendants. The trial court also erred in determining that the FAR provision is inoperable without written notice. The trial court did, however, properly grant summary judgment against Allison on count five based upon rescission, and the court also properly struck the affidavits of Junod and Daniluck based upon the fact that they were irrelevant to the issues before the trial court at that time. Finally, the trial court did not err in denying Allison's motion for leave to amend the complaint.

The decision of the trial court is affirmed in part, reversed in part, and remanded for further proceedings not inconsistent with this opinion.

KIRSCH and CHEZEM, JJ., concur.

---

**8.** References in this section to Appellant's Brief are to Appellant's Brief in Interlocutory Appeal from Denial of Motion for Leave to Amend.

**9.** Allison asserts that "[c]ontrary to the Marion Superior Court's ruling, Allison was not required to allege newly discovered evidence to justify the timing of its motion seeking leave to amend." Appellant's Brief at 14. Allison is correct. A party is certainly not always required to allege that it has new evidence; however, such evidence may be considered by the trial court in determining whether the delay was "undue." The trial court was simply pointing out that there were no circumstances before it that mitigated Allison's four-year delay, thereby making its delay not "undue." The only justification Allison presents for the delay is the trial court's entry of summary judgment against it on the other counts discussed herein.