**NORTHROP CORPORATION,**
**Northrop Aircraft Division,**
**Appellant–Defendant,**

v.

**GENERAL MOTORS CORPORATION**
**and Allison Engine Company,**
**Inc., Appellee–Plaintiffs.**

No. 49A02–0205–CV–428.

Court of Appeals of Indiana.

April 27, 2004.

George T. Patton, Jr., Andrew M. McNeil, Bryan H. Babb, Sandra H. Perry, Bose McKinney & Evans, LLP, Indianapolis, IN, Joseph F. Coyne, Paul S. Malingagio, Pro Hac Vice, Sheppard Mullin Richter & Hampton LLP, Los Angeles, CA, Attorneys for Appellant.

Terrill D. Albright, Joseph H. Yeager, Jr., Baker & Daniels, Indianapolis, IN, John L. Rice, Scott E. Pickens, Pro Hac Vice, Pillsbury Winthrop LLP, Anthony J. Trenga, Pro Hac Vice, Miller & Chevalier, Chartered, Washington, DC, Attorneys for Appellees.

**OPINION**

DARDEN, Judge.

### STATEMENT OF THE CASE[1]

Northrop Corporation, Northrop Aircraft Division, n/k/a Northrop Grumman Corporation ("Northrop"), appeals the trial court's judgment in the amount of $67,669,492.05 in favor of General Motors Corporation and Allison Engine Company, Inc. ("Allison").

We affirm.

### ISSUES

Northrop has raised three (3) main issues with approximately ten (10) sub-issues, which we consolidate, as follows:

1. Did the trial court commit reversible error when it denied Northrop's motion for judgment on the evidence?

2. Did the trial court commit reversible error in instructing the jury?

3. Did the trial court err by awarding Allison prejudgment interest?

### FACTS

We commence this opinion by adopting the FACTS as outlined by another panel of this court in *General Motors Corp. v. Northrop Corp.*, 685 N.E.2d 127, 130–132, (Ind. Ct.App.1997), *trans. denied*, as follows:

The facts of this case are extensive and complicated. This action began with the United States Air Force who, in 1986, chose Northrop and Lockheed Aircraft Company (Lockheed) to build the Air Force's new Advanced Tactical Fighter (ATF) aircraft. Both Lockheed and Northrop were to build two ATF prototypes. The ATFs and their design were to be analyzed by the Air Force, and the company whose aircraft was judged, overall, to be more satisfactory would be awarded all future ATF work. Simultaneously, the Air Force was holding a similar competition between General Electric Corporation (GE) and Pratt & Whitney (P & W) for design of the ATF's engines. Each company would also develop two engines, one to be installed in each of the two aircraft.

The design of Northrop's stealth aircraft was unique in that the aircraft's engines were embedded within the ATF's body. Utilizing this design, the engine's high-temperature exhaust, around 4000 degrees, would flow in a channel over the rear deck of the aircraft, thus reducing radar and infrared observability. A key to the success of the design was the development of an engine exhaust liner (EEL), which is an insulating structure that would allow the

---

1. Oral argument was held on February 12, 2004. We thank counsel for their presentations.

aircraft to withstand the heat produced by the ATF"s engines.

In mid–1987, Northrop at first contracted with P & W and GE in order to do some design work on the EELs. However, Northrop subsequently felt that it may be better served subcontracting the EEL development work because the engine companies may have been too consumed with the engine competition. On August 17, 1987, Northrop issued requests for proposals (RFP) to Allison and Rohr Industries, Inc (Rohr). This request incorporated product function specification (PFS)[2] and statement of work (SOW)[3] information about the liner environment and work to be performed developing the EEL. The RFP explained that the parties were to submit firm fixed prices for the development of the EEL and any questions regarding errors, ambiguities or inconsistencies in the RFP should be brought to Northrop's attention immediately. Northrop also provided Allison and Rohr with the PFS and SOW. None of the documents included any pressure/shock data nor did either company note the need for such data. Allison and Rohr had nine days to review the data and submit a proposal.

Rohr submitted a proposal to Northrop priced at $4 million, and Allison submitted a proposal priced at over $13 million. Northrop evaluated the two proposals and accepted the Allison bid, finding that Rohr's proposal was "technically unacceptable." Record at 7085. The Rohr proposal called for a liner weighing 308 pounds, which was over twice the weight of the liner proposed by Allison.

Northrop and Allison entered into negotiations for development of the EEL. Although Allison had originally proposed a contract with a repricing option, it agreed to develop the EEL at a firm fixed price, regardless of which final design was chosen for the EEL. The contract between Northrop and Allison also contained numerous provisions requiring Allison to provide notice to Northrop of any changes in the scope of the work. The most significant of these provisions incorporated Federal Acquisition Regulation (FAR) 52.24[3]–7, a notification of changes requirement, into the contract.

Allison asserts that Northrop was in the best position to accurately predict the engine exhaust conditions that the liner would have to meet and that Northrop had generated voluminous test data regarding those test conditions which was unavailable to Allison. Allison also asserts that the information which Northrop provided was incomplete and misleading. In fact, according to Allison, Northrop had conducted years of simulations and tests in conjunction with the government, generating extensive data critical to the design and pricing of the EEL. However, Allison claims that when it described an original plan for design of the liner to Northrop in August of 1987, albeit before Allison submitted a bid for the project, Northrop did not inform Allison that it had test data indicating that Allison's perception of the liner environment was wrong.

On October 29, 1987, Allison personnel attended a meeting with GE representatives to discuss the EEL. A GE engineer showed Allison a chart which ap-

---

**2.** A product function specification describes the function of a particular product, the space it needs to fit into, and its environmental surroundings. (Tr. p. 4690).

**3.** A statement of work describes how the design is to be accomplished and what tests are to be conducted. (Tr. p. 4690).

peared to be based upon Northrop test data. The chart indicated to Allison that the liner environment would be significantly different than had been indicated by Northrop, and Allison engineers knew that the information would force Allison to develop a heavier and more expensive liner design.

After seeing the chart, Allison immediately asked Northrop for all of the relevant data, emphasizing the importance of the information and the fact that this was a potentially catastrophic situation. Northrop responded a few days later by providing Allison with a few charts, but they contained only a fraction of the information which Allison required. The new information, however, did indicate that Northrop's original specifications were in error and that the GE chart was accurate. Allison continued to pressure Northrop for information, and its understanding of the EEL environment gradually increased. Finally, Allison began to develop a new liner concept, known as a honeycomb-tile design, in order to accommodate the newly-discovered environment. Never, however, did Allison provide Northrop with a written notification of changes in the scope of the contract as required by FAR 52.24[3]–7.

Northrop asserts that the charts which Allison saw at GE were not significant to Allison because of the fact that they showed the pressure levels that the EEL would experience but that the charts indicated that the EEL might be operated in over expanded or under expanded conditions. According to Northrop, Allison believed that this expansion could cause high pressure/shock levels in excess of those that Allison had assumed based upon P & W data. Northrop further asserts that Rohr's engineers, as well as the P & W engineers

with whom Allison met, testified that they knew that the ATF engines would operate in such conditions. Finally, Northrop asserts that all supersonic jet engines operate in over and under expanded conditions and therefore have pressure/shock levels in the engine exhaust stream.

This suit ensued in September of 1991. On June 20, 1995, the trial court entered the first of many entries on Northrop's various motions for summary judgment.

\* \* \* \* \* \*

*Id.* at 130–32 (original footnotes omitted) (footnotes 2 and 3 added).

Reviewing the trial court's grant of summary judgment, we held

> that the trial court erroneously granted summary judgment as to counts three [superior knowledge], four [changes in the scope of work], and six [defective specifications]. Both count three and count six allege causes of action which under California law may be brought against private defendants. The trial court also erred in determining that the FAR provision is inoperable without written notice.

*Id.* at 142.

We also determined that federal law would apply to the specialized terms of the contracts as set out in the FARs, and that California law would control the resolution of the common law causes of action. *Id.* at 134–35.

Pursuant to remand, a thirty-day jury trial began on January 22, 2002 in the Marion County Superior Court on the remaining issues. After weighing the evidence, the jury returned verdicts for Allison on all counts related to the EEL and

the Trailing Edge (TE) [4] in the amount of $25,850,434 and $5,427,862, respectively. Thereafter, the trial court, pursuant to California Code § 3287(a), awarded Allison prejudgment interest in the amount of $36,391,196.05. The trial court determined that, alternatively, under California Code § 3287(b), it could have awarded prejudgment interest in the amount of $33,266,396.80.

During the course of the trial, the jury heard testimony from dozens of witnesses and reviewed hundreds of pages of documentary exhibits. All issues were vigorously contested between Allison and Northrop. Virtually all of the FACTS as found in *General Motors Corp., supra,* were presented to the jury during the course of the trial. The ensuing additional facts and evidence were presented to the jury before arriving at its verdict.

The jury heard evidence that the determination of pressure levels was critical to the ATF's development for several reasons. First, if the engine's thrust could be fully expanded through the nozzle, then the engine would have achieved maximum possible thrust. Second, the high-pressure environment generated on the aft deck would result in a high rate of heat transfer from the exhaust to the aircraft's frame, requiring a more robust solution to protect the ATF's frame. Thus, in order to determine the type of environment in which the EEL would have to operate, Northrop conducted a series of classified tests beginning in June 1985. After the first series of tests (the 505 test) were completed, Northrop compiled a report revealing that pressures along the nozzle and aft deck

were high and variable depending on the operating conditions.[5]

In March 1986, Northrop conducted another series of tests (the 505–A test). These tests again simulated environmental conditions at subsonic and supersonic speeds. Northrop compiled another report showing that pressures remained high and variable along the aft deck. Later, in August 1986, Northrop conducted more tests (the 505–II test) on the nozzle and aft deck to measure the pressure levels and cooling effectiveness to assist it in designing and developing an aft deck for the aircraft. Northrop prepared another report that showed that the pressure levels continued to remain high and variable along the aft deck.

In January 1987, Northrop commenced yet another series of tests (the 520 test). These tests were also designed to measure pressure levels. However, the results of the tests again revealed that the pressure levels were sometimes high, depending on the operational environment. Later, in the spring of 1987, Northrop tested another liner that it was working on; unfortunately, it also failed to withstand the extreme heat from the engine exhaust stream. There was testimony that Northrop was desperate for a solution at this point in time. Northrop began an anxious search for a solution to its problem and asked P & W if it had a solution.

Having been selected to work on a prototype engine for the ATF, P & W had enlisted Allison's help in developing its engine nozzle. P & W informed Northrop that the only substance it was aware of that could protect the aft deck from the heat of the engine exhaust was a product invented by Allison called Lamilloy [6]; P &

---

4. The TE consisted of the last two rows of tiles that formed into a V-pattern at the end of each EEL. In effect, the TE was the last eight inches of the ATF.

5. The record indicates that these tests could take up to one year to design and develop.

6. It is a material made of laminated layers of high-temperature resistant perforated metal materials. Compressed air is bled from the

W suggested that Northrop contact Allison for assistance.

From August 4–6, 1987, Allison and P & W engineers had a series of meetings to discuss design concepts for an engine exhaust liner. During those meetings, P & W's engineers told Allison's engineers that they could assume that the pressure could be between 15 and 20 pounds per square inch (psi), a ratio of 1.33, or what otherwise could be termed a low-pressure environment.

On August 7, 1987, Allison and P & W engineers presented design concepts, including their assumptions about low-pressure along the aft deck, to Northrop. The concept rated most able to withstand the exhaust environment was the "pillow concept." (Tr. p. 3023). Allison informed Northrop that this was a low-pressure design based on P & W's pressure specifications. Northrop complimented their work and suggested that they continue "thinking about it." (Tr. p. 2952).

Subsequently, Northrop decided that it would be more efficient for it to contract directly with Allison. On August 12, 1987, Allison engineers traveled to Northrop's headquarters in California for additional discussions concerning the EEL with a larger group of Northrop personnel. After repeating its August 7, 1987 presentation, Allison and Northrop discussed the pressure environment along the aft deck. Allison asked Northrop if it had any "additional data beyond what Pratt & Whitney had given them, . . . ." (Tr. p. 2954). Northrop responded that it did not know anything beyond what P & W had specified. Further, when Allison asked whether GE's engine would produce a different pressure environment, Northrop said that there would not be any surprises and directed

Allison to go back to P & W and GE for additional data.

On September 22, 1987, Northrop notified Allison by letter that it had been selected "as the subcontractor for the development, manufacture, and delivery of the YF–23 Exhaust Liner." (Pl.Ex. 263 p. 1). The contract and its incorporated exhibits "provide the total description, detail schedule, and terms & conditions for performance of authorized efforts. The total fixed price for this effort is $11,876,198." *Id.*

On October 29, 1987, personnel of Allison and Northrop attended a meeting with GE representatives to discuss the EEL. GE was also under contract with Northrop to work on engine exhaust liner concepts. While GE presented Northrop with the results of its work, it mentioned that its design took into account wide pressure variations within the exhaust stream. Allison became aware at this point that GE's design was inconsistent with its low-pressure design and assumptions, and engaged GE's engineers in a discussion about the pressure environment. GE's engineers produced data from Northrop's test series showing wide pressure variations. After the meeting, Allison's design coordinator, Larry Junod (Junod), asked John Shupek (Shupek), a Northrop heat transfer specialist, if Allison's pillow-tile design was going to be exposed to high pressure. Shupek stated that high pressure was possible but that he would have to talk with other people to make sure. Junod explained, "[T]hat could be devastating. We have to have all of that data that you have on that subject because if that sort of thing is going to happen, our concept won't work

---

engine through the perforations in the Lamilloy to provide a layer of protection from the exhaust stream. It is specifically designed for

cooled airframe and propulsion system components exposed to high gas temperature environments. (Allison's Addendum Tab 9).

and we're going to have to start over." (Tr. p. 3046).

The next day, upon returning to Indianapolis, Junod impressed upon Shupek how critical it was for Allison to understand the pressure environment. Junod asked Shupek if the data GE presented was Northrop's data, and Shupek confirmed that the data came from tests Northrop had conducted. Shupek also confirmed that there was more data. Junod then requested all data that Northrop had concerning the pressure environment on the aft deck. Shupek warned Junod that the data was classified and that certain steps would have to be taken to insure that the data was distributed properly.

On November 3, 1987, Shupek sent Allison a nine-page letter containing "selected liner pressure data that Northrop obtained from the Fluidyne Model 505–II and Model 520 test series." (Pl.Ex.290). The data confirmed Allison's concerns about pressure variations on the aft deck. In computer simulations, Junod entered Northrop's data in the "model of the pillow tile to see what kind of stresses would be generated and to see whether it would fail; and indeed it did." (Tr. p. 3050). He attempted to make variations in the pillow tile, including thickening the tiles, but the concept failed to withstand the high heat and pressure. Believing that the limited data in the nine-page letter was insufficient to begin designing a new liner, Allison continued pressuring Northrop to release all pressure data.

During November and December of 1987 and January 1988, Allison employees,

Junod and Edward Turner (Turner), had a series of meetings with Northrop employees Tom Jannetta (Jannetta), lead engineer for exhaust system integration; Marty Bradley (Bradley), a propulsion analyst who helped setup the 505 and 505–II tests; and Brad Bergman (Bergman), an engineer doing work in fluid dynamics. During these discussions, Junod and Turner "came to find out" about numerous pressure tests conducted by Northrop at Fluidyne and NASA's facilities in Virginia and California. (Tr. p. 3056). Northrop personnel then explained that certain design features would prevent operating the engines in a fully expanded or low-pressure condition, as was its original intention. Using the data from these tests and the computer simulations developed by Bergman, they jointly began developing a pressure specification by which Allison could design an effective EEL.

In the meanwhile, on November 20, 1987, Bob Paris (Paris), a Northrop propulsion engineering consultant, had sent Northrop a memorandum stating that although the decision to use Allison's Lamilloy tiles had accelerated the acoustic testing program, the ATF program still remained a "high risk development program." (Pl.Ex. 880.0001) (emphasis in original). Paris noted the following items that "must be addressed immediately": (1) all engine exhaust data must be provided to Allison immediately; (2) the preliminary design review [7] should be postponed beyond January 1988 to avoid selection of a design that was based on "incomplete data and analysis"; and (3) a fixture for the boilerplate test scheduled

7. "A series of control gates at which the Buyer reviews and approves the Provider's proposed Design-to baseline as evidenced by lower level performance specifications and associated test plans and authorizes the Provider to proceed with detail design. All hardware, software, handling equipment, test equipment, and tooling should be sequentially reviewed in the descending order of system to assembly." Weidman Comparative Glossary of Project Management Terms v2.1 *at* http://www.pmjorum.org/library/glossary/PMG—P04.htm.

for April or May 1988 should be built as soon as possible. (Pl.Ex.880.0001–2).

On December 18, 1987, Paris sent another memorandum noting that progress in the design of the EEL was being made, but cautioning that lack of "knowledge of the environment that the liner must" endure put the design program at risk. (Pl. Ex.881.0003). He further emphasized that "[t]wo items which put the liner design at risk [are] the availability of engine data and the late testing of the boilerplate liner behind an engine." (Pl.Ex.881.0003).

Still facing a preliminary design review scheduled for January 8, 1988, Allison began to consider a concept called the "honeycomb tile" design in November 1987. On January 31, 1988, Paris reported to Northrop that Allison was still proceeding with the design of the EEL without knowing the "actual engine environment as measured behind the engine." (Pl.Ex. 884.0001). He warned that neither engine company had given "all of the required data" to Allison. (Pl.Ex.884.0001). Finally, on February 12, 1988, Northrop and Allison executed a pressure specification agreement for the EEL.

The process of designing and developing the EEL took place over the next year and a half. During that time, according to Allison, Northrop revised many of the specifications for the EEL. Many of the originally scheduled test dates had to be rescheduled for later dates while Allison redesigned, redeveloped, and rescheduled its workforce to comply with Northrop's revisions. For example, the preliminary design review that was originally scheduled for January 8, 1988 did not take place until March 1, 1988; the detailed design review,[8] originally scheduled for May 1988,

did not take place until May 4, 1989; the design validation test, originally scheduled for June 1988, did not take place until February 1989; and the ground test of the EEL, originally scheduled for April 8, 1989, did not take place until September 1989. However, the target date for the first flight remained the same. Allison asserted that due to Northrop's behavior, which caused numerous setbacks and revisions, it eventually compressed its work schedule to a 24–hour, seven-day-a-week work schedule.

In early 1988, when Northrop and Allison could not agree as to what the environment would be for the shoulders of the EEL, Allison informed Northrop that it would proceed according to its understanding of the environment. Under pressure from Northrop to stay on schedule, Allison continued with its design of the EEL, and also began to design the shoulders of the EEL, even though it lacked design specifications concerning the environment along the shoulders. The only shoulder design specifications that Allison possessed were drawings of the shoulders contained in the SOW. However, in February 1988, when Allison received computer tapes from Northrop showing "a constantly changing cross-section," it had to build a part to accommodate the change. (Tr. p. 3797). Northrop specifically excluded the use of titanium, requiring Allison to develop a solution that ultimately required the use of more expensive alloys.

In February 1988, Allison discovered that Northrop had given it erroneous engine cycle data because the computer model that generated the data had simulated an uninstalled engine. When Northrop later gave Allison data simulating an install-

8. "A formal, documented, comprehensive and systematic examination of a design to evaluate the design requirements and the capability of the design to meet these requirements and to identify problems and propose solutions." Weidman Comparative Glossary of Project Management Terms v2.1 *at* http://www.pmjorum.org/library/glossary/PMG—D02.htm

ed engine, Allison realized that the pressure from the engine to the honeycomb tiles was too low; hence, it had to modify its initial design.

There was evidence that Allison could not complete the EEL without an attachment scheme depicting where the EEL would be secured to the aft deck. Neither tooling nor the parts could be manufactured until this information was known, and only Northrop had this information. Early in January 1988, Allison explicitly requested this information so that it "could remain on schedule." (Tr. p. 3803). However, Northrop did not give this information to Allison until October 4, 1988.

In April 1988, Allison declined Northrop's request that it take on the TE project and made an offer to sell Northrop the Lamilloy necessary for it to develop the TE. However, Northrop insisted that Allison take on the work. Allison acceded to Northrop, but it refused to agree to a delivery schedule date. On June 8, 1988, Allison submitted a fixed price proposal of $2.2 million for the TE project. Allison stated that it was committed to meeting the delivery schedule, but that "it will be difficult given the late start of this effort." (Pl.Ex.388–1.0002). On June 24, 1988, Northrop gave Allison permission to proceed with the "development, manufacture, and delivery" of the TE. (Pl.Ex.392–1.0001).

In order to design the TE, Allison needed to know the operational environment of the fairings, which are shiny pieces of metal attached to the EEL shoulders that would help secure the TE. Because Northrop did not tell Allison if the fairings would be subjected to the 4,000–degree flames of the exhaust stream, Allison could not begin designing a cooling system for the TE. In the meantime, LeAnne Steen (Steen), Northrop's procurement manager, sent a letter dated October 19, 1988 to

Allison insisting that the TE be delivered by April 7, 1989, the EEL's delivery date. (Pl.Ex. 616).

On October 29, 1988, Northrop and Allison entered into a Fairings Agreement in which they outlined the assumptions under which Allison would proceed. Attempting to meet the April 7, 1989 deadline, Allison continued to compress its work schedule and moved to what it called "war-time mobilization." (Tr. p. 3830).

Northrop's manufacturing manager, Bill Reid, remained on-site at Allison, and Kurt Roedel made monthly visits. Beginning as early as September and October of 1988, Sidney Hudson (Hudson), Allison's director of engineering, began informing Northrop that its revisions were going to have a cost impact on the contract's price. Because much of Allison's work had been subcontracted to other companies, and there were outstanding invoices and work in progress, Hudson could not come up with an accurate figure; however, he estimated that there would be approximately a $1 million impact. Northrop responded by instructing Allison not to inform it of any cost impact until it had an accurate figure.

Even though by October 1988, the final design of the EEL was not complete, Northrop demanded that Allison begin manufacturing the honeycomb tiles for the EEL and TE. In November 1988, Northrop demanded that Allison hire an additional subcontractor to assist in the manufacture of the honeycomb tiles; Allison hired Aerobraze in Cincinnati, Ohio. Because Aerobraze was not familiar with Lamilloy, Allison had to expend personnel and other resources to instruct Aerobraze in the manufacturing technique used to produce the honeycomb tiles.

On December 16, 1988, Allison finally received the specifications for the acoustic environment surrounding the EEL.

(Def.Ex.3298). The PFS and SOW originally outlined the "anticipated acoustic load spectra for the engine exhaust liner . . . for both the Pratt and Whitney and General Electric engines." (Pl.Ex. 237.1). However, the acoustic data in the PFS and SOW had been inaccurate.

In January 1989, Allison informed Northrop that there would be a cost overrun in the EEL program of approximately $12 million. (Pl.Ex.620). Northrop was later notified that Allison had met with its attorneys and concluded that it had grounds for a claim against the cost overruns. Because Allison's focus was on the timely completion of the EEL and TE, it informed Northrop that a claim would be submitted at a later date; Northrop did not object.

On January 6, 1989, Allison informed Northrop that it was withdrawing its TE proposal because its "latest cost estimate" for the TE was $4.4 million. (Pl.Ex. 424–1). On January 19, 1989, Allison sent Northrop a letter wherein it wrote that "as of December 31, 1988," Allison had spent $740,000 toward the design and development of the TE, an amount in excess of the initial authorization amount. (Pl.Ex. 428–1).

In February 1989, the design validation test of the EEL was conducted at P & W's test facility and was a success. After the tests, P & W commented to Northrop that "only the Allison Lamilloy design appears viable for aircraft use at this time." (Pl. Ex. 619).

Throughout the spring of 1989, Northrop and Allison continued to negotiate a price for the TE. After several on-site visits, Northrop reduced the amount of work Allison was required to devote to developing the TE, and Allison subsequently reduced its proposal price to $3.8 million. However, Northrop refused to agree to Allison's price.

In May 1989, Allison completed its design of the EEL. At a meeting on May 19, 1989, Blake Wallace, Vice President and General Manager at Allison, informed Northrop that Allison was preparing a final change order proposal that would address the cost overruns associated with all of the numerous changes Northrop had made to the design of the EEL.

Allison later submitted its summary of the change orders and Northrop subsequently rejected it asserting that the changes were either requested by Allison or not identified as changes that would have had a cost impact in Allison's proposal. As a result of the impasse, Allison stated that it would stop work on the TE. However, pursuant to the terms of the contract, Northrop demanded that Allison "continue performance without disruption or interruption on this critical program." (Pl.Ex.454–1.0001).

Allison continued working on the design and development of the TE. As of June 19, 1989, Allison sent Northrop expenditure profiles reflecting that actual current costs through May 31, 1989 for the EEL and its tooling were $13,448,000. (Pl.Ex.692). Allison also informed Northrop it projected that by September 1990, it would cost Northrop $26,421,000 "for the engine exhaust liner alone." (Tr. p. 2196). In addition, the cost for the TE through May 1989 was estimated to be $2,070,075 and projected to rise to $3,973,075 by January 1990. The total cost to complete both the EEL and TE programs was projected to cost Northrop $31,190,000. Despite receiving notice of these expenditure profiles, Northrop did not object or protest, but continued to pressure Allison to maintain its schedule.

On August 28, 1989, Allison sent Northrop another funds expenditure profile indicating that as of July 31, 1989, the

estimated EEL expenditures had cost Northrop $16,833,966 and the TE expenditures had cost $3,185,504. Additional expenditure profiles were sent on November 27, 1989, which reflected that as of October 31, 1989, the estimated EEL expenditures had cost Northrop $26,576,786. On March 26, 1990, Allison sent yet another set of expenditure profiles to Northrop, which estimated the total cost of the EEL program to be $39,535,413, plus $3,355,571 for tooling costs. At no time did Northrop object or protest the profiles or order Allison to stop work.

The finalized version of the EEL was installed in the ATF in the fall of 1989, and successfully passed the first test flights on October 27, 1989 and again on December 1, 1989. "Allison completed and delivered the last of [the] nine [EELs] to Northrop on June 19, 1990." (Northrop's Br. at 11).

On August 27, 1990, Allison sent Northrop a claim requesting reimbursement for the increased costs it had incurred to design and develop the EEL; Allison's claim for $29,596,414 included the costs to produce the EEL, including profit, but less payments previously made by Northrop. In December 1990, Allison also filed a claim requesting payment of $7,308,714 for the cost, including profit, of producing the TE.

On February 2, 1991, Northrop informed Allison that its claims were being denied. Specifically, Northrop stated that Allison's "view that Northrop withheld critical test data which was available prior to contract go-ahead was unfounded." (Pl. Ex.551.0001). Additionally, Northrop asserted that Allison knew that the EEL would be subjected to significant shocks, and that it had provided Allison with all relevant data.

Throughout the program, Allison contended that it had in place three government-approved computer tracking systems to track and account costs. It also had an information management system (IMS) and a continuing monitoring system (CMS) which tracked parts and the amount of time employees spent working on a particular project. The third system, Artemis, applied negotiated government rates to the parts and labor information collected by IMS and CMS. Northrop sent a financial team to inspect and review Allison's accounting practices, financial records and tracking system and did not detect any unusual accounting practices.

In September 1991, Allison filed suit alleging numerous breach of contract claims. Northrop subsequently filed numerous motions for summary judgment. On June 20, 1995, the trial court initially denied Northrop's motion for summary judgment on all counts except one, seeking rescission of the contract. Upon Northrop's motion to reconsider, the trial court granted summary judgment in favor of Northrop on the remaining counts.

As noted above, Allison appealed the trial court's grant of summary judgment in Northrop's favor. On September 12, 1997, the Court of Appeals affirmed the trial court's grant of summary judgment concerning rescission of the contract, but reversed the trial court's grant of summary judgment on the remaining counts, and remanded for trial. As a result, the remaining claims at issue for trial were: (1) that Northrop had superior knowledge (superior knowledge claim) directly related to fulfilling Allison's obligations under the EEL contract and that Northrop failed to disclose that information; (2) that Northrop provided Allison with defective EEL specifications (defective specifications claim); and (3) that Northrop made changes and refinements to the original EEL specifications and failed to pay for the cost impact of those changes (changes in the scope of work claim). In addition,

Allison alleged that a fixed price had never been negotiated for the work it performed on the TE, that Northrop demanded that Allison continue to perform work as required under the terms of the contract, and that Northrop failed to pay a reasonable price for its work on the TE. Allison claimed damages and prejudgment interest in the amount of $29,805,634 for the EEL and $7,308,714 for the TE. Further, Northrop filed a counterclaim against Allison alleging that it was entitled to $2.6 million for work that Allison did not complete on the EEL and TE.

After hearing the evidence, the jury found for Allison on all counts related to the EEL and TE in the amount of $25,850,434 and $5,427,862, respectively, excluding the funds Northrop had previously paid to Allison. The jury found against Northrop on its counterclaim.

On April 24, 2002, the trial court held a hearing at Allison's request regarding prejudgment interest. The trial court noted that the parties agreed that California law governed any award of prejudgment interest. On May 3, 2002, the trial court entered its order of final judgment on the jury's verdict and awarded prejudgment interest. The trial court found that Allison was entitled to prejudgment interest pursuant to California Code § 3287(a) and awarded Allison $36,391,196.05 in prejudgment interest. The trial court's order indicated that, alternatively, under California Code § 3287(b), it could have awarded Allison prejudgment interest in the amount of $33,266.396.80. The trial court then entered final judgment against Northrop in the amount of $67,669,492.05. On May 31, 2002, Northrop filed its notice of appeal.

## DECISION

■ This case involves a defense acquisition contract that includes choice of law provisions that were previously interpreted by this court in *General Motors Corp. v. Northrop Corp.*, 685 N.E.2d 127 (Ind.Ct.App.1997), *trans. denied.* As such, the doctrine of the law of the case applies. This doctrine is a discretionary tool by which our appellate courts may decline to revisit legal issues already determined on appeal in the same case and on substantially the same facts. *Cutter v. State*, 725 N.E.2d 401 (Ind.2000). "The purpose of this doctrine is to promote finality and judicial economy." *Id.* at 405. Therefore, as found in *General Motors Corp.*, the federal common law will govern the application of standard government procurement regulations and California law will govern the resolution of Allison's common law claims. Indiana law will govern procedural issues.

1. *Judgment on the Evidence*

At the conclusion of Allison's presentation of evidence, Northrop moved for judgment on the evidence. Northrop argued to the trial court that Allison had failed to present sufficient evidence to prove its claims. The trial court took the motion under advisement. Northrop then presented evidence. After Northrop concluded its presentation, Allison also moved for judgment on the evidence. After briefly hearing arguments, the trial court denied both parties' motions and the matter was submitted to the jury.

■ The purpose of a motion for judgment on the evidence is to test the sufficiency of the evidence, and the grant or denial of a motion for judgment on the evidence is within the broad discretion of the trial court and will be reversed only for an abuse of that discretion. *Hartford Steam Boiler Inspection and Ins. v. White*, 775 N.E.2d 1128 (Ind.Ct.App.2002), *trans. denied.* The relevant portion of Indiana Trial Rule 50(A) reads:

Where all or some of the issues in a case tried before a jury or an advisory jury are not supported by sufficient evidence ..., the court shall withdraw such issues from the jury and enter judgment thereon. . . .

On appeal, we use the same standard of review as the trial court in determining the propriety of a judgment on the evidence. When the trial court considers a motion for judgment on the evidence, it must view the evidence in the light most favorable to the non-moving party. Judgment may be entered only if there is no substantial evidence or reasonable inferences to be drawn therefrom to support an essential element of the claim.

*Hartford Steam Boiler Inspection and Ins.*, 775 N.E.2d at 1133 (quoting *Liberty Mutual Insurance Co. v. Blakesley*, 568 N.E.2d 1052 (Ind.Ct.App.1991)).

When reviewing a trial court's ruling on a motion for judgment on the evidence, we examine the evidence and the reasonable inferences most favorable to the plaintiff from a quantitative as well as qualitative perspective. Quantitatively, evidence may fail only where there is none at all; however, qualitatively, it fails when it cannot reasonably be said that the intended inference may logically be drawn therefrom. The failure of inference may occur as a matter of law when the intended inference can rest on no more than speculation or conjecture.

*Hartford Steam Boiler Inspection and Ins.*, 775 N.E.2d at 1133.

### 1(a). Superior Knowledge and Defective Specifications

■ Northrop first argues that Allison failed to present sufficient evidence to support the jury's verdict on its superior knowledge claim. Specifically, Northrop argues that Allison failed to prove that Northrop was aware that it possessed superior knowledge as it related to Allison's contract performance, or that Northrop knew the Fluidyne pressure data was not known or reasonably accessible to Allison. In response, Allison argues that the jury heard overwhelming evidence of how Northrop devoted substantial resources over several years to conduct tests with the sole purpose of developing pressure data concerning the EEL. In addition, the jury heard evidence that Northrop asserted that the Fluidyne pressure data was classified and unavailable to Allison, and that Northrop told Allison that the data was irrelevant to its design and development of the EEL. Also, the jury heard evidence that Paris, Northrop's propulsion engineering consultant, warned Northrop in at least two memoranda that Allison's design could be compromised by the lack of data.

■ The superior knowledge claim is effectively one of fraudulent nondisclosure. In the absence of a fiduciary or confidential relationship, a party may bring an action for fraudulent nondisclosure where a defendant (1) fails to disclose material facts that it knew or believed to be true; and (2) the defendant had a duty to disclose those facts. *San Diego Hospice v. County of San Diego*, (1995) 31 Cal. App.4th 1048, 37 Cal.Rptr.2d 501; *Karoutas v. HomeFed Bank*, (1991) 232 Cal. App.3d 767, 283 Cal.Rptr. 809. A duty to disclose may arise when (1) the material fact is known or accessible only to the defendant; and (2) the defendant knows that the plaintiff is unaware of the fact or cannot reasonably discover the undisclosed fact. *Id.* "Undisclosed facts are material if they have a significant and measurable effect on market value." *Karoutas*, 232 Cal.App.3d at 771, 283 Cal.Rptr. 809. It is a question of fact for a jury to determine (1) whether the matter which was undisclosed was of sufficient materiality; and

(2) whether the defendant had actual knowledge of the undisclosed fact. *Shapiro v. Sutherland,* (1998) 64 Cal.App.4th 1534, 76 Cal.Rptr.2d 101. "A breach of the duty to disclose gives rise to a cause of action for rescission or damages." *Karoutas,* 232 Cal.App.3d at 771, 283 Cal.Rptr. 809.

 Northrop also argues that there was insufficient evidence to support Allison's defective specifications claim. Specifically, Northrop argues that Allison was not misled nor did it reasonably rely upon Northrop's bid documents. Northrop asserts that its bid documents contained unwarranted performance specifications and not warranted design specifications, that Rohr had no complaints about the bid documents, and that it did not contemplate that Allison's performance could only be accomplished using the contract documents. In response, Allison argues that the jury heard ample evidence of Northrop representing the aft deck of the ATF to be a low-pressure environment. Further, Allison asserts that the SOW provided that the EEL's design was to be based on a low-pressure environment and that it acted reasonably in relying upon Northrop's assurances that a low-pressure design would be adequate.

 To recover under its defective specifications claim, Allison must prove by a preponderance of the evidence that (1) it reasonably relied upon, or was reasonably misled by, Northrop's specifications; (2) Northrop's specifications were incorrect; and (3) Allison submitted a bid that was lower than it would have if the specifications had been accurate. *General Motors Corp.,* 685 N.E.2d at 140–141 (citing *Coleman Engineering Co. v. North American Aviation, Inc.* (1966), 65 Cal.2d 396, 55 Cal.Rptr. 1, 420 P.2d 713; and *MacIsaac and Menke Co. v. Cardox Corp.* (1961), 193 Cal.App.2d 661, 14 Cal.Rptr. 523).

As mentioned in FACTS, determining the pressure levels was critical to the development of the EEL because pressure levels affect (1) whether the ATF would achieve maximum thrust; (2) the ATF's radar observability; and (3) the amount of heat transferred from the exhaust to the aft deck. The record shows that from June 1985 to August 1986, Northrop conducted a series of tests (the 505, 505–A, 520, and 505–II tests) using scale models to measure the pressure along the aft deck. The results showed that pressure along the aft deck was high and variable depending on the operating conditions.

In addition, testimony from numerous experts revealed that the test data was material to the development of the EEL. Dr. Joseph Hoffman (Dr. Hoffman), a retired professor of mechanical engineering at Purdue University, gave expert testimony on Allison's behalf that Northrop's test data "would have told Allison a low-pressure design would not work." (Tr. p. 2913). Dr. Hoffman stated that while Northrop's tests did not measure the entire range of pressure within which the engine was capable of operating, the data showed enough non-uniform pressures beyond those provided by P & W to indicate that a low-pressure concept would not adequately protect the aft deck. Dr. Hoffman also testified that Northrop's test data was more detailed than the guidelines given to Allison by P & W and should have been included in the SOW. Everett Turner (Turner), an engineer employed by Arnold Engineering Development Center in Tennessee, also gave expert testimony on behalf of Allison that Northrop withheld test data that was material to the design of the EEL. In addition, Marty Bradley, a Northrop propulsion engineer, testified in his video deposition that the testing results were the best source of pressure data.

Evidence was also presented showing that Northrop refused to disclose its test data concerning the pressure environment on more than one occasion. Even before Northrop issued its RFP, it was made aware on August 7, 1987 that Allison and P & W were developing the "pillow concept," a low-pressure design. Evidence was presented showing that at an August 12, 1987 meeting, Allison asked Northrop personnel if they had any "additional data beyond what Pratt & Whitney had given them, . . . ." (Tr. p. 2954). Northrop personnel stated that they did not have additional information. Junod testified that the RFP, which was issued on August 17, 1987, contained no data on static pressure; this was despite the fact that the SOW stated, "the subcontractor shall conduct a detailed acoustic analysis from *data provided by Northrop* and the engine companies." (Pl.Ex. 237.1) (emphasis added). At a pre-bidding contractual conference on August 19, 1987, Allison again inquired as to what kind of pressure environment existed on the aft deck, but Northrop stated it did not have any useful data. On October 29, 1987, after Junod received conflicting information from GE's engineers, he insisted that Shupek provide Allison with all data concerning the pressure environment. Sam Reider (Reider), Allison's chief engineer for Lamilloy products, testified, "It was absolutely baffling to us why we didn't have this data; . . . ." (Tr. p. 5423). Junod explained that the existence of a high-pressure environment would be devastating to Allison's low-pressure "pillow concept." Shupek eventually admitted that the data GE was using came from Northrop. However, it was not until November and December of 1987, and January of 1988 that Allison became aware of the tests conducted by Northrop in 1985 and 1986, and it was not until February 12, 1988 when Northrop and Allison finally executed a pressure specification agreement.

Despite Northrop's refusal to give Allison its pressure data, Dr. Hoffman testified that based upon the limited information and data Allison had been given before it finally received Northrop's test data, it was reasonable for Allison to propose a low-pressure design; he stated that because the concept was new, Allison's low-pressure design was consistent with what Northrop had told the Air Force about how the ATF would be operated.

The record also shows that the test data was unavailable to Allison. In fact, Junod testified that the test data was classified and that Allison had to follow certain procedures before Northrop would release it to Allison. Turner also testified that the test data was not known or reasonably available to Allison because it was classified. Robert Titlow, Allison's contract administrator, also testified that the ATF project information was classified. For example, during the initial contract negotiations between Allison and Northrop, Allison's negotiating team was separated and isolated into two groups, with only Reider, Allison's chief engineer for Lamilloy products, being allowed access to technical details because he had a security clearance. Further, Sidney Hudson, Allison's director of engineering during the ATF project, testified that Allison had never built an exhaust liner or conducted research on the pressure environment behind an afterburning engine.

The evidence was sufficient for the jury to find that Northrop possessed knowledge superior to Allison and that such knowledge should have been disclosed to Allison prior to its bidding on the contract to design and develop the EEL. Further, the record reveals that the jury heard evidence that Northrop had conducted nu-

merous pressure data tests over the years and knew that the EEL would be operated in a high-pressure environment; that said data was classified and primarily in or under the control of Northrop; that Northrop had a duty to disclose said data to Allison; that the data initially disclosed to Allison was incorrect; that Allison had a right to reasonably rely upon or was reasonably misled by the data disclosed by Northrop; and that Allison submitted a bid that was lower than it would have provided if the specification data had been accurate. The evidence was sufficient for the jury to find in favor of Allison on both its superior knowledge and defective specifications claims.

### 1(b). Change in Scope of Work

Finally, Northrop argues that there was insufficient evidence to support Allison's change in the scope of work claim. Specifically, Northrop argues that it did not cause any increased costs incurred by Allison to change from its pillow-tile design concept to the honeycomb design concept. Additionally, it argues that any changes in the EEL design were not actual changes in the scope of the work, and that Allison failed to provide notice as required by the change in scope provisions within the contract. In response, Allison argues that through silent affirmation, statements by Northrop officials, and Northrop's submission of inaccurate design specifications, Northrop led Allison to initially design the low-pressure pillow-tile concept. Allison further asserts that there was ample evidence that Northrop had both actual and constructive notice that Allison would submit a claim for the increased costs associated with the EEL, resulting in an equitable adjustment in the contract price.

 Generally, to succeed in claiming that a buyer changed the scope of the work called for in the contract, the plaintiff must show that it notified the buyer that it perceived a given order as a change of the contract's terms and that the person who ordered the change possessed the requisite authority. *Northrop Grumman Corp. v. United States,* 47 Fed.Cl. 20 (2000). The plaintiff must also show that the alleged change is actually a change of the terms of the contract and not merely a direction that a given product fails to satisfy the requirement set forth in the performance specifications. *Id.* However, strict adherence to the notice requirements outlined in a contract may become less important if the evidence shows that the buyer has actual or constructive knowledge of the facts and events underlying the claim. *General Motors Corp.,* 685 N.E.2d at 136–37 (citing *H.H.O. Co. v. United States,* 12 Cl.Ct. 147 (1987)).

 "It is settled that a contractor's failure to adhere to the notice requirements of contract clauses can result in claims presented pursuant to said clauses being disallowed. On the other hand, one should not be technical or illiberal in the 'notice' area, as indicated above." *Id.* at 136 (quoting *H.H.O. Co.,* 12 Cl.Ct. at 164).

In evaluating the purpose of a notice provision in a case where the plaintiff had provided the government with written notice of a *possible* claim but not notice of a claim as provided by the contract, the United States Claims Court pointed out that the notice provision serves two purposes. First, the notice allows the government to:

see the undisturbed conditions for evaluation purposes, and second, [it allows] the [g]overnment to exercise control over the resolution of the problem.... [P]rimarily[,] the notification requirement is a litigation avoidance mechanism. Its purpose is practical, not punitive. It is a device to stimulate the [g]overnment to take its own investigative action and per-

haps corrective measures in conjunction with the contractor. For that reason, notice does not need to be in any specific format; it need only clearly show the existence of the condition.

*General Motors Corp.*, 685 N.E.2d at 137 (quoting *Brechan Enterprises v. United States*, 12 Cl.Ct. 545, 549 (1987) (citations omitted)).

It is a question for the jury as to whether Northrop was aware of the operating facts of each of the involved claims and whether its actions should be deemed a waiver of the notice requirements of the various contract clauses. *H.H.O. Co.*, 12 Cl.Ct. 147. However, Allison might not have been entitled to an equitable adjustment if Northrop could have shown that it was prejudiced by Allison's failure to timely notify Northrop of a change in the scope of work. *Perry–McCall Construction, Inc. v. United States*, 46 Fed. Cl. 664 (2000).

■■■ If a buyer is found to have actual or constructive notice of the facts underlying the claim, a constructive change issue arises for work exceeding the scope of the contract 'if the [buyer] either expressly or impliedly ordered work outside the scope of the contract, or if the [buyer] otherwise caused the [contractor] to incur additional work.' *SIPCO Services Marine Inc. v. United States*, 41 Fed.Cl. 196, 223 (1998) (quoting *Miller Elevator Co. v. United States*, 30 Fed.Cl. 662, 678 (1994)). In assessing whether the work exceeds the scope of the contract, the court is guided by the principle that each case shall be judged according to its own facts, considering the scope and quality of the changes ordered and the cumulative effect of such direction on the project as a whole. *Id.* at 223. The work must have been directed by the buyer and not volunteered by the contractor. *Id.*

Therefore, Federal Acquisition Regulation 52.243–7(e) allows as follows:

(e) *Equitable adjustments.* (1) If the Contracting Officer confirms that [Northrop's] conduct effected a change as alleged by [Allison], and the conduct causes an increase or decrease in [Allison's] cost of, or the time required for, performance of any part of the work under this contract, whether changed or not changed by such conduct, an equitable adjustment shall be made—

(i) In the contract price or delivery schedule or both; and

(ii) In such other provisions of the contract as may be affected.

(2) The contract shall be modified in writing accordingly. In the case of drawings, designs or specifications which are defective and for which [Northrop] is responsible, the equitable adjustment shall include the cost and time extension for delay reasonably incurred by [Allison] in attempting to comply with the defective drawings, designs or specifications before [Allison] identified or reasonably should have identified, such defect.... The equitable adjustment shall not include increased costs or time extensions for delay resulting from [Allison's] failure to provide notice or to continue performance as provided, respectively, in (b) and (c) above.

*General Motors Corp.*, 685 N.E.2d at 136 (quoting 48 CFR 52.243–7).

■■■ Here, there was sufficient evidence for the jury to render a verdict in favor of Allison on its change in scope of work claim. The jury heard evidence that Northrop was competing with Lockheed for a future ATF contract worth an estimated $50 billion. In addition, the Master Agreement stated, Time is of the essence in the performance of this Order. (Pl.Ex. 254.0020). Specifically, Allison attempted to notify Northrop of the anticipated cost

overruns; however, Northrop instructed Allison to continue work and demanded that Allison hire an additional subcontractor, thereby requiring Allison to expend unanticipated resources.

The Master Agreement also contained a notification clause in paragraph 5.[9] Concerning this notification clause, the jury heard testimony from Titlow, Allison's contracts administrator who negotiated the terms within the Master Agreement. He stated that, in its original form, paragraph 5 made Allison responsible for the costs of any changes, but that Allison did not agree to it because it was more business risk than [it] could accept. (Tr. p. 2166). Titlow testified that the purpose of the final version of paragraph 5 was to allow Northrop to continually refine the specifications, but that Northrop had to pay for any cost increase over $1,000. He stated that Allison did not contemplate the notice provisions in paragraph 10 to have any impact on the changes made under paragraph 5.[10]

Under cross-examination, Titlow testified that the lack of any hard data or the ill-defined specifications could cause cost increases. (Tr. p. 2272). He also stated that the notice provision in paragraph 10 had applied to buyer-directed changes and not constant refinement of technical specifications. Although Avram Tucker, a financial analyst giving expert testimony on Northrop's behalf, testified that Allison's claims were not proper, Titlow testified that Northrop was on notice of the cost impact because they were always informed, attended meetings, and occupied offices at Allison's headquarters.[11] In fact,

9. Paragraph 5 reads a follows:

Northrop and Allison agree to finalize a Product Function Specification (PFS) for the Exhaust Liner within two months of execution of this Agreement at no change in contract price, provided the change cost impact to the PFS is less than $1,000.

Continued refinement of the PFS up to six months after execution of this Agreement will be considered within the subcontract scope at no change in contract price, provided the refinement cost impact is less than $1,000. (Northrop's Addendum Tab 13).

10. Paragraph 10 reads as follows:

A. Buyer may at any time, by written directive or Order, make reasonable changes within the general scope of this Order, in any one or more of the following: (a) drawings, designs, and specifications; (b) method of shipping and packaging; (c) place of inspection, delivery or acceptance; (d) increases in quantities; (e) changes in delivery schedules; and (f) the amount of buyer furnished property. If any such changes causes an increase or decrease in the cost of or in the time required for the performance of any part of the work under this Order, whether changed or not changed by any such order, an equitable adjustment shall be made in the purchase price or delivery schedule, or both, and this Order shall be so modified in writing. Unless otherwise agreed, any claims by Seller for adjustment under this clause must be asserted within 30 days from the date of the receipt by Seller of such written order. If Seller includes in its claim any costs for property made obsolete or excess by any changes, the title to such property, at the option of the Buyer, shall pass to Buyer and shall thereafter be subject to the provisions of the "Responsibility for Property" clause herein and shall be delivered as directed by Buyer. Buyer has the right to examine any of Seller's pertinent books and records for the purpose of verifying Seller's claim. Nothing in this clause shall excuse Seller from proceeding with this Order as changed, including failure of the parties to agree upon any adjustment to be made under this clause.

B. In addition to the changes noted above, Buyer may at any time by written notice (in accordance with paragraph 33 herein, entitled "Modification of Data Requirement") make changes to the SDRL [Supplier Data Requirements List] requirements, or for the amount of data to be provided pursuant to Buyer's Order(s).

(Northrop's Addendum Tab 15).

11. During oral argument, Allison's counsel stated that Northrop had a continuous presence at Allison's Headquarters commencing in October 1988.

a Northrop progress payment authorization memorandum dated December 1989 stated that Allison's performance is monitored daily by Status Reports, Technical Interface Meetings and on a monthly basis by Program Reviews. (Def.Ex.2987.0820). When asked why Allison did not give Northrop formal written notice of the actual cost impact, Titlow stated that calculating the actual cost was impossible because the cost was constantly changing because of the changes in specifications. When asked. if Allison was stretching the truth in calculating the cost impact, Titlow said that was also impossible because government auditors were present.

Concerning Northrop's changes, the jury heard evidence of how Northrop repeatedly provided Allison with a changing array of engine-cycle data. The jury heard testimony about how changing engine-cycle data would mean changing the pattern of holes in the Lamilloy and the configuration of the radiation shield and feet on the underside of the honeycomb tiles. The record shows that as a result of the erroneous engine-cycle data, Allison had to develop a titanium radiation shield to fit underneath the EEL. This project had to be subcontracted to Flameco, a Utah company. Using a process called super plastic forming, a die was fabricated (costing over $1 million); twenty-seven titanium pieces were produced and pressed into three configurations (costing over $1 million); and the three pieces were then welded into a single shield for each of the nine EELs. The record also shows that Northrop continued to make changes in the engine-cycle data until October 1988.

In addition, the jury heard evidence that Allison had informed Northrop of its understanding of the pressure environment along the shoulders of the EEL. Northrop subsequently gave Allison computer tapes showing that the pressure environment

along the shoulders was constantly changing. Allison informed Northrop that it would have to manufacture the shoulders from "either nickel-based, cobalt-based, or iron-based alloys[ ]" because Northrop had specifically excluded using titanium. (Pl. Ex. 831 Tab 77). Allison informed Northrop that this process would be time consuming and expensive.

Further, the jury heard John Daniluck (Daniluck), Allison's chief project manager, testify that every component of the EEL was affected by several change specification memoranda and that Allison tracked spending with an accounting system approved by the federal government. Daniluck testified that despite Northrop's changes and delays in providing necessary information to Allison, Northrop continued to pressure Allison to remain on schedule. Daniluck testified that Northrop even insisted that Allison begin fabrication of the honeycomb tiles before the acoustic test and design validation process was complete. Therefore, Allison had to begin manufacturing of the tiles without detailed drawings, which was unusual.

Daniluck also testified that Northrop was aware of the effect these changes were having on pricing but continued to pressure Allison to stay on schedule. In fact, Daniluck testified that Steen, Northrop's manager of major subcontracts, threatened that Northrop would sue "if our deliveries are late, and as a result they're not first to fly and they lose this contract, [Northrop] will sue Allison for a billion dollars, including [Daniluck] personally named as a defendant." (Tr. p. 3834). Frank Gillette (Gillette), a former P & W engineering manager responsible for the design and development of the engine, also testified that Northrop wanted this contract "in the worst way." (Tr. p. 4162). Gillette stated that the contract was worth an estimated $50 billion dollars because it

was expected that the Air Force would order 700 planes at an estimated cost of $50 to $70 million each.

The jury heard evidence of how Hudson told Northrop in September and October of 1988 that there was going to be a cost impact on the contract's price, and how Northrop instructed Allison not to inform it of a cost impact until it had an accurate figure. As mentioned earlier, Northrop continued pressuring Allison to maintain its production schedule. Northrop also insisted that Allison hire another subcontractor, Aerobraze, to facilitate the manufacturing of the tiles; this resulted in Allison having to spend time and resources to instruct Aerobraze in the techniques used to produce the honeycomb tiles.

The jury heard evidence that in January 1989, Allison informed Northrop that the EEL program would have a cost overrun of approximately $12 million. (Pl.Ex.620). The jury was presented with evidence that Steen had met with Titlow in June 1989 to discuss the total cost of the program, and that Allison was submitting monthly cost expenditures to Northrop. Despite receiving an expenditure profile in May 1989 projecting the total cost of the EEL program to be $31,190,000, Northrop did not protest and Allison continued to meet the deadlines set by Northrop.

As a result of the evidence presented during the trial, the jury had sufficient evidence to find that (1) Northrop made numerous refinements to the PFS having a cost impact greater than $1,000; (2) Northrop's conduct caused the changes; (3) Northrop had either actual or constructive notice of the cost impact; and (4) that Northrop failed to pay Allison for the cost of the changes or make an equitable adjustment in the contract price. The trial court's judgment denying Northrop's motion for judgment on the evidence is affirmed.

## 2. *Jury Instructions*

Northrop appeals the submission of final instructions 15, 18, 20, 22, 23, 23A, 24, 29, and 34 to the jury.

 "The manner of instructing the jury is committed to the sound discretion of the trial court." *Armstrong v. Federated Mutual Insurance Co.,* 785 N.E.2d 284, 287 (Ind.Ct.App.2003), *trans. denied.* An instruction informs the jury of the law applicable to the facts without misleading the jury and to enable it to comprehend the case clearly and arrive at a just, fair, and correct verdict. *Id.* We will reverse only upon a showing of an abuse of discretion. *Id.* "Even if we conclude that a trial court erred in instructing the jury, reversal is not always warranted. If we determine that the verdict would not have differed had the jury been properly instructed, such error is deemed harmless." *Id.* at 287. Further, "It is well-established and elementary that instructions to the jury must be viewed as a whole and construed in harmony with each other and it is not necessary for any one instruction to contain all the law applicable to the case." *Martin v. Roberts,* 464 N.E.2d 896, 902 (Ind.1984).

### 2(a). *Instruction 15*

With regard to Final Instruction 15, the trial court instructed the jury as follows:

With respect to the EEL, Allison first claims that Northrop breached its obligation to disclose to Allison, before they entered into a contract on September 22, 1987, certain data, model test data, and other information. This is called Allison's Superior Knowledge claim. In order for Allison to recover for Northrop's breach of its obligation to disclose superior knowledge, Allison must prove the

following by a preponderance of the evidence:

(1) That Northrop had information that was material to the pricing or performance of the parties' EEL contract;

(2) That the information was known or accessible only to Northrop;

(3) That Northrop knew, or *reasonably should have known*, that the information was not known or reasonably accessible to Allison; and

(4) That the information was not *disclosed* to Allison before entering into the contract.

If you find that Allison proved all of these propositions by a preponderance of the evidence, then you may find for Allison on its superior knowledge claim and determine Allison's damages in accordance with the instructions on damages that I will give you.

However, if you find that Allison has not proved all of these propositions, then your verdict must be for Northrop on Allison's claim for breach of contract for failure to disclose superior knowledge. (Northrop's App. p. 932) (emphasis added).

■ Northrop argues that this instruction incorrectly states the law by stating that it "reasonably should have known" that Allison could not have obtained the test data. (Northrop's App. p. 932). Specifically, Northrop argues that this instruction conflicts with this court's decision in *General Motors Corp.* because that language was not included as part of the elements of the superior knowledge claim. Allison argues that this language correctly states California's law on a superior knowledge claim.

In addition, Northrop argues that the word "disclosure" in this jury instruction "did not come from any California case." (Northrop's Br. at 34). Northrop asserts that California law requires that "courts give words their ordinary dictionary meaning unless special meaning is required." (Northrop's Br. at 43). Northrop puts forth the following definition of "disclosure" from BLACK'S LAW DICTIONARY (6th ed.1991), "to bring into view by uncovering; to expose; to make known; to lay bare; to reveal knowledge; to be free from secrecy or ignorance, or make known."

■ Here, we find that Final Instruction 15 was "technically" incorrect. However, because the jury's verdict would not have been different, we find that the tendering of this defective instruction is harmless error. *Armstrong*, 785 N.E.2d at 290 (Ind.Ct.App.2003) (jury instruction harmless if jury verdict would not have differed). In *Warner Constr. Corp. v. Los Angeles*, (1970) 2 Cal.3d 285, 85 Cal.Rptr. 444, 466 P.2d 996, the California Supreme Court found that there were three instances where non-disclosure of material facts might support a cause of action. One of those instances was where "the facts are known or accessible only to the defendant, and the defendant *knows* they are not known to or reasonably discoverable by the plaintiff." *Id.* at 294, 85 Cal.Rptr. 444, 466 P.2d 996 (emphasis added). In *General Motors Corp.*, we cited this precedent and stated "that a duty of disclosure on the part of Northrop would only exist if the information regarding the pressure shock environment was known or accessible only to Northrop and if Northrop *knew* that this information was not known or reasonably accessible to Allison." 685 N.E.2d at 139 (emphasis added). As a result, Final Instruction 15 should have instructed the jury that Northrop had to have actual knowledge that the information was not known or reasonably accessible to Allison.

However, Allison submitted evidence that Northrop had actual knowledge that the pressure-shock data was not known or reasonably accessible to Allison. As we have mentioned, evidence was introduced showing that Northrop's test data was more detailed than that given to Allison by P & W; that the data was classified; and that special procedures were necessary in order to make it available to Allison. Having considered this evidence, we find that the jury's verdict would not have been altered. In addition, the use of the word "disclosure" in this instruction does not mislead the jury. As Allison's claim is that Northrop failed to *disclose* its test data, it is appropriate that the jury be instructed that Allison must prove that Northrop failed to disclose the relevant information. As a result, Final Instruction 15 is not erroneous.

### 2(b). Instruction 18

██ With regard to Final Instruction 18, the trial court instructed the jury as follows:

With respect to the EEL, Allison also claims that Northrop breached its obligation to provide correct specifications to Allison by providing Allison with design specifications that were defective because they did not contain the design specifications that Allison needed to design and manufacture the EEL. This is called the Defective [S]pecifications claim.

In order for Allison to recover on this claim, Allison must prove the following by a preponderance of the evidence:

(1) That Allison reasonably relied upon, or was reasonably misled by, Northrop's specifications.

(2) That Northrop's design specifications were incorrect; and

(3) That Allison submitted a bid that was lower than it would have been if the specifications were accurate.

If you find that Allison proved all of these propositions by a preponderance of the evidence, then you may find for Allison on its defective specifications claim and determine Allison's damages in accordance with the instructions on damages that I will give you.

However, if you find that Allison has not proved any or all of these propositions, then your verdict may be for Northrop on Allison's defective specifications claim.

(Northrop's App. p. 935).

Northrop argues that Final Instruction 18 was defective because it failed to tell the jury what damages were recoverable. In essence, Northrop argues that this instruction allows Allison to recover damages for the total cost of its work and not solely for work performed within the contract's scope. In response, Allison argues that other instructions cure any defect.

We find that Final Instruction 24 cures any alleged defect in Instruction 18.[12] As we mentioned above, jury instructions must be "viewed as a whole and construed in harmony with each other and it is not necessary for any one instruction to contain all the law applicable to the case." *Martin*, 464 N.E.2d at 902. Final Instruction 24 informs the jury that the measure of Allison's damages concerning the EEL contract "is that amount which will compensate Allison for all the loss caused by *Northrop's breach* and those losses, which in the ordinary course of things, would be likely to result from Northrop's breach." (Northrop's App. p. 943). Therefore, we find that Final Instruction 18 is not erroneous when read in conjunction with the remaining final instructions.

12. Final Instruction 24 is included under section 2e.

## 2(c). *Instruction 20*

With regard to Final Instruction 20, the trial court instructed the jury as follows:

I have already instructed you that the term "material information" means information that a person in Allison's position might have reasonably considered important under the circumstances in making its decisions about the contract. If you decide that Northrop gave incorrect information to Allison, and you decide that the information was material under the definition I have given you, then you may presume that Allison *reasonably relied* on or was reasonably misled by that information. Northrop can overcome that presumption by showing that Allison did not in fact rely on, or was not in fact misled by, the incorrect information.

(Northrop's App. p. 937) (emphasis added).

██ Northrop argues that Final Instruction 20 eliminated the requirement that Allison's reliance on the defective specifications be reasonable. Allison argues that the instruction does require that its reliance be reasonable. Specifically, Allison asserts that the instruction requires that a person in its position must have "reasonably considered" the information important "in making its decisions about the contract." (Northrop's App. p. 937).

We disagree with Northrop's contention that Final Instruction 20 requires the jury to presume Allison's reliance was reasonable. While the instruction does inform the jury that it *may presume* that Allison's reliance was reasonable, it further instructs the jury that it may only do so *after* having *determined* whether the information Northrop gave to Allison was *material*. The instruction defines "material information" as "information that a person in Allison's position might have reasonably considered important under the circum-

stances in making its decisions about the contract." While this final instruction would have been better if it defined "material information" in terms of what Allison "would" rather than "might" have considered important, the instruction did not mislead the jury. As a result, the instruction does require the jury to determine whether Allison's reliance on the information was reasonable under the circumstances.

## 2(d). *Instruction 23A*

With regard to Final Instruction 23A, the trial court instructed the jury as follows:

### Final Instruction 23A

With regard to Allison's Changes claim, in another instruction I have told you that there are provisions of the Master Agreement which require Allison give written notice to Northrop before Allison can obtain an equitable adjustment [to] the contract price based upon a change. I have also told you that the applicability of such provisions requiring written notice of a change is in dispute and that you must resolve that dispute [by] deciding, based upon all the circumstances, what were the intentions of the parties at the time.

If you find that one or more of the contract provisions requiring written notice apply, then I instruct you that what the law calls "constructive notice" may fulfill the requirements of any such notice provision. You may find that Northrop was given "constructive notice" sufficient to fulfill the requirements of any contract which requires written notice, if you find that Allison has demonstrated, by a preponderance, that Allison gave Northrop essentially the same information as was required by the applicable changes provisions.

The notice requirements do not apply to the superior knowledge claim, the defective specifications claim or to the trailing edge claim.

 Northrop argues that Final Instruction 23A is defective because it specifically states that Allison's superior knowledge and defective specification claims are not subject to the notice provisions within the contract. Northrop argues that these claims are "subject to the contract itself." (Northrop's Br. at 28).

We disagree. Notice is not an element of either the superior knowledge or the defective specification claims.[13] *See San Diego Hospice*, 31 Cal.App.4th 1048, 37 Cal.Rptr.2d 501; *Karoutas*, 232 Cal. App.3d 767, 283 Cal.Rptr. 809; *General Motors Corp.*, 685 N.E.2d 127. In addition, concerning Allison's superior knowledge claim, it is unclear how Allison could have given Northrop notice that Northrop was in possession of a material fact known or accessible only to Northrop. *San Diego Hospice, supra.* Concerning Allison's defective specification claims, it is also unclear how Allison was to give notice to Northrop that the EEL specifications were incorrect. As the evidence indicated, Allison was not initially aware that Northrop was in possession of the EEL pressure data. As a result, we cannot say that Final Instruction 23A is defective resulting in reversible error.

## 2(e). Instructions 22 and 23

With regard to Final Instructions 22 and 23, the trial court instructed the jury as follows:

### Final Instruction 22

The first Changes in the Scope of Work claim is that under Paragraph 5 of the Master Agreement, the parties agreed as follows:

"Continued refinement of the PFS up to six months after execution of this Agreement will be considered within the subcontract scope with no change in contract price, provided the refinement cost impact is less than $1,000."

For the purposes of this contract provision, you are instructed that the parties are deemed to have executed the Agreement on September 22, 1987.

In order for Allison to recover for breach of this provision, Allison must prove

(1) That there were refinements of the PFS after September 22, 1987;

(2) That such refinements had a cost impact over $1,000; and

(3) That Northrop failed to pay Allison an increased contract price for such refinements to the PFS.

If you find that Allison proved all of these propositions by a preponderance of the evidence, then you may find for

---

**13.** Northrop made no objection to Instruction 23A upon grounds that it erroneously eliminated the Trailing Edge claim from the notice requirements of the contract. To be sure, that work was part of the overall contract between the parties and would seem to be subject to a change in the scope of work notice requirement. However, Northrop's objection was only that the trial court had "indicated that the notice provisions would not apply to the defective spec[ification] and superior knowledge claim." (Northrop's Br. at 27 and Tr. 8106). No objection was made to the inclusion of the Trailing Edge claim along with the two extra-contractual common law claims.

Furthermore, in its argument before this court, Northrop specifically asserts that with regard to the Trailing Edge claim, the *only* issue was whether there had been an agreed price for the work and if not, what was a reasonable price. Thus, Northrop has not contended and does not now contend that the notice provisions were applicable to the Trailing Edge portion of the contract.

Accordingly, the phrasing of Instruction 23A provides no basis for relief to Northrop from the verdict and judgment.

Allison on its changes claim and determine Allison's damages in accordance with the instructions on damages that I will give you.

However, if you find that Allison has not proved any or all of these propositions, then your verdict must be for Northrop on Allison's changes claim.

(Northrop's App. p. 939).

### Final Instruction 23

The second Changes in the Scope of Work claim is that with respect to the EEL, Allison claims that Northrop breached their contract by refusing to make an equitable adjustment to the contract price because of changes effected by Northrop's conduct.

You are instructed that, under the Master Agreement, the parties agreed that if Northrop's conduct effected a change and caused an increase in Allison's cost of performance, an equitable adjustment would be made in the contract price. Therefore, in order for Allison to recover for Northrop's breach of this contract provision, Allison must prove:

(1) That Northrop's conduct effected a change to the contract;

(2) That Northrop's conduct caused an increase in Allison's cost of performance under the contract; and

(3) That Northrop failed to make an equitable adjustment in the contract price.

If you find that Allison proved all of these propositions by a preponderance of the evidence, then you may find for Allison on its changes claim and determine Allison's damages in accordance with the instructions on damages that I will give you.

However, if you find that Allison has not proved all of these propositions, then

your verdict must be for Northrop on Allison's changes claim.

(Northrop's App. p. 940).

 Northrop argues that these instructions are defective because they relieve Allison of its responsibility to "comply with the changes provisions in the contract as set forth in the later instructions." (Northrop's Br. at 17). In addition, Northrop asserts that the instructions are mandatory in that they require the jury to find for Allison, and they nullify the notice provisions in the contract. As a result, Northrop argues that it was prejudiced and should be granted a new trial. In response, Allison argues that the instructions are not mandatory because they specifically state that the jury "may" find for Allison if Allison proves the elements by a preponderance of the evidence. Allison further argues that instructions 23A, 23B, and 27 make clear that its changes claims were subject to the contract notice provisions within the contract, and because Allison's superior knowledge and defective specification claims are extra-contractual common law claims, the jury was properly instructed that the notice provisions do not apply to those claims.

We find that Final Instructions 22 and 23 are not erroneous. It is true, and we have noted, that a contractor's failure to adhere to the notice provisions within a contract can result in subsequent claims being disallowed. *See General Motors Corp.*, 685 N.E.2d at 136–37 (citing *H.H.O.*, 12·Cl.Ct. at 164). Likewise, it is also true that the facts of a given case may allow for a less technical or liberal reading of a contract notice provisions. *Id.* For example, a constructive change order issue may arise if Northrop had actual or constructive notice of the facts underlying the claim. *SIPCO Services & Marine Inc.*, 41 Fed.Cl. 196. In other words, "a constructive change issue arises for work exceeding

the scope of the contract 'if [Northrop] either expressly or impliedly ordered work outside the scope of the contract, or if [Northrop] otherwise caused [Allison] to incur additional work.'" *Id.* at 223 (citation omitted). The fact finder is "guided by the principle that each case shall be judged according to its own facts, considering the scope and quality of the changes ordered and the cumulative effect of such direction on the project as a whole." *Id.*

In this case, we find that Final Instructions 23A, 23B, and 27 eliminate any perceived requirement that the jury disregard the Master Agreement's notice provisions. *See Martin,* 464 N.E.2d 896 (jury instructions are to be read as a whole). The instructions, read as a whole, clearly inform the jury that they must decide (1) the parties' intentions regarding the notice provisions within the Master Agreement; (2) whether Allison gave Northrop written notice that the changes in the scope of work were having a cost impact; (3) whether Northrop had constructive notice of the cost impact of the changes; (4) whether Northrop was prejudiced by any lack of notice; (5) whether Allison is entitled to an equitable adjustment in the contract price; and (6) whether any of Allison's recoverable costs should be reduced by the amount of any increase in Northrop's costs caused by Allison's failure to provide notice. As a result, these instructions cure any alleged error.

### 2(f). Instruction 24

With regard to Final Instruction 24, the trial court instructed the jury as follows:

The measure of Allison's damages for breach of the EEL contract is that amount which will compensate Allison for all the loss caused by Northrop's breach and those losses, which in the ordinary course of things, would be likely to result from Northrop's breach. Allison may therefore receive those damages naturally arising from Northrop's breach, or those damages that might have been reasonably contemplated or foreseen by both parties at the time they made the contract as the probable result of Northrop's breach.

In establishing the amount of damages, mathematical precision is not required. It is sufficient for Allison to provide a reasonable basis for you to approximate the amount of damages.

(Northrop's App. p. 943).

Northrop argues that this instruction is defective. Specifically, Northrop argues that Final Instruction 24 incorrectly tells the jury to award Allison the total cost of performing under the contract. Citing *Amelco Electric v. City of Thousand Oaks,* (2002) 27 Cal.4th 228, 115 Cal.Rptr.2d 900, 38 P.3d 1120, Northrop asserts that the proper method of calculating damages is to determine the actual cost, "where each element of extra expense is linked to a proven breach and added up for a total award." (Northrop's Br. at 44). Further, Northrop argues that the trial court erroneously excluded evidence that would have shown that Allison was asserting a total cost claim and that Allison caused much of the cost overruns through inefficiency and mismanagement.

Allison responds by arguing that this instruction is a "standard, classic, instruction on damages." (Allison's Br. at 83). Allison asserts that the instruction provides that Allison should be compensated only "for all the loss caused by Northrop's breach and those losses, which in the ordinary course of things, would be likely to result from Northrop's breach." (Northrop's App. p. 943). Additionally, Allison argues that California law supports the instruction as submitted to the jury.

We acknowledge that California law disfavors an award of damages

under the total cost theory. *Amelco*, 27 Cal.4th 228, 115 Cal.Rptr.2d 900, 38 P.3d 1120. "Under this method, damages are determined by 'subtracting the contract amount from the total cost of performance.'" *Id.* at 243, 115 Cal.Rptr.2d 900, 38 P.3d 1120 (citation omitted). A jury may be permitted to award damages under the total cost methodology, but the plaintiff must "establish (1) the impracticality of proving actual losses directly; (2) the plaintiff's bid was reasonable; (3) its actual costs were reasonable; and (4) it was not responsible for the added costs." *Id.* at 243, 115 Cal.Rptr.2d 900, 38 P.3d 1120. However, even before "this method may be used, the *trial court* bears the initial responsibility of determining that each element of the four-part test set forth above can be met." *Id.* at 244, 115 Cal.Rptr.2d 900, 38 P.3d 1120 (emphasis added).

■■■ Here, we find that Final Instruction 24 was not defective. First, unlike *Amelco*, the jury in this case was not instructed on awarding damages based on Allison's total cost. The instant instruction mirrors pattern California Civil Jury Instruction 10.90, and it makes no mention of the total cost theory of damages.[14] Second, although Northrop tendered to the trial court a total cost instruction, the trial court appears to have followed *Amelco's* holding by rejecting Northrop's instruction, apparently deciding that the evidence did not warrant tendering a total cost instruction. As a result, we cannot say that the trial court abused its discretion or that

Final Instruction 24 misled the jury. *See Armstrong*, 785 N.E.2d 284.

### 2(g). Instruction 29

With regard to Final Instruction 29, the trial court instructed the jury as follows:

With respect to the Trailing Edge, there is no dispute that:

(1) Allison and Northrop entered into a contract whereby Allison would design and manufacture the Trailing Edge.

(2) Allison did design and manufacture the Trailing Edge and supplied it to Northrop; and

(3) Allison has not been paid any amount for its work on the Trailing Edge contract.

The parties dispute what amount of money is owed to Allison under the Trailing Edge contract.

You are instructed that a contract such as the one between Allison and Northrop for the Trailing Edge need not include a price to be binding. Parties may agree to be bound by a contract even when they otherwise dispute the price to be paid for the goods in question. If the parties fail to agree on a price, the law provides that the price is a "reasonable price" at the time of delivery. A reasonable price is what a willing buyer would pay a willing seller for the goods. Where, as here, there is no market price for the goods, you may determine a reasonable price based on

---

**14.** California Civil Jury Instruction 10.90 reads as follows:

The measure of [general] damages for the breach of a contract is that amount which will compensate the injured party for all the [detriment] [or] [loss] caused by the breach, or which in the ordinary course of things, would be likely to result therefrom. The injured party should receive those damages

naturally arising from the breach, or those damages which might have been reasonably contemplated or foreseen by both parties, at the time they made the contract, as the probable result of the breach. As nearly as possible, the injured party should receive the equivalent of the benefits of performance.

the actual cost of the goods, plus a reasonable profit.

Allison claims that it and Northrop never agreed to a price, and that Northrop breached the contract by failing to pay Allison a reasonable price for the Trailing Edge at the time of delivery. Northrop, however, claims that it and Allison did agree on a price for the Trailing Edge, and that Allison is entitled to no more than that price.

You are instructed that you are to determine what amount Northrop owes Allison under the Trailing Edge contract. If you find that the parties never agreed upon a price, then Northrop is liable for breach of contract for failing to pay a reasonable price when the Trailing Edge was delivered. You may then determine, in accordance with these instructions, what a reasonable price for the Trailing Edge is, and award Allison that amount as damages.

However, if you find that the parties did agree upon a price for the Trailing Edge, then your verdict may be for Allison for the price agreed upon.

(Northrop's App. p. 948–49).

■ Northrop argues that this instruction "erroneously introduced breach-of-contract themes into the [Trailing Edge] issue, and the verdict form improperly directed a verdict for Allison." (Northrop's Br. at 55). Specifically, Northrop asserts that the issue was not whether the contract was breached, "but whether a price was reached and, if not, what was the reasonable price." (Northrop's Br. at 57). Further, Northrop argues that the verdict form erroneously read, "You must find for Allison on the [TE] claim." (Northrop's Br. at 56). Instead, the verdict forms should have read "for or against Allison on the [TE] claim." (Northrop's Br. at 56). Allison argues that the instruction is a correct statement of the issues.

We are unclear as to how Final Instruction 29 "erroneously introduced breach-of-contract themes into the TE issue,...." (Northrop's Br. at 55). It was uncontested that Northrop failed to pay Allison for the work it performed on the TE. As Final Instruction 30 specifically states, "What is in dispute is how much money Northrop should pay Allison for that work, and that is a dispute which [the jury] must resolve." (Northrop's App. p. 950). "There is also no dispute that Northrop and Allison had a contract for Allison to design and build nine (9) Trailing Edges for the Engine Exhaust Liners." (Northrop's App. p. 950). Because Allison was not paid for its work in designing and building the TE, Northrop breached the contract. *See Careau & Co. v. Security Pacific Business Credit, Inc.,* (1990) 222 Cal.App.3d 1371, 272 Cal.Rptr. 387 (A cause of action for damages for breach of contract is comprised of the following elements: (1) the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to plaintiff.). The only issue was the amount of damages to be paid to Allison.[15] As a result, Final Instruction 29, especially when read in conjunction with Final Instruction 30, does not mislead the jury. For the same reasons, the challenged jury verdict forms were also correct.

*2(h). Instruction 34*

■ With regard to Final Instruction 34, the trial court instructed the jury as follows:

Northrop claims that Allison should not recover under its EEL claims because its originally proposed pillow tile could not have survived the acoustic levels of the exhaust environment. You

15. As was more fully explained in footnote 13.

are instructed that if you find that Allison proposed the pillow tile as a consequence of Northrop's material omissions or misrepresentations, then you may not consider in any respect whether the pillow tile could have survived in the acoustic environment, and you may not consider in any respect the pillow tile assessing Allison's damages for Northrop's breach of contract.

(Northrop's App. p. 956).

Northrop argues that this instruction is erroneous because it is a mandatory instruction. Northrop asserts that it is mandatory because the "trial court told the jury that if they found Northrop withheld certain information, they could not consider acoustics in the design shift." (Northrop's Br. at 41). Allison argues that the survivability of the pillow-tile concept is irrelevant in determining whether Northrop's material omissions or misrepresentations caused Allison to propose the pillow-tile design. Further, Allison argues that Final Instruction 34 "is not a disfavored mandatory instruction because it does not set out all the essential elements of a claim and then direct the jury to find for a party on satisfactory proof of all those elements." (Allison's Br. at 79).

Mandatory instructions are ones which attempt to set up a factual situation directing the jury to a certain result. Mandatory instructions are disfavored in the law, ... and our courts have repeatedly cautioned trial judges about the dangers of giving instructions which are mandatory in form. Thus, it is well within a trial court's discretion to refuse a tendered instruction when it can be framed to cover the principle of

law without mandatory language. Moreover, where, as here, a trial court tenders numerous final instructions, the jury is unlikely to be misled by a one-word nuance. As our supreme court has previously observed,

Instructing a jury is a most difficult and complex process. It is generally conceded that there has been an overemphasis placed upon the wording and refined meaning of instructions which far exceed their actual effect upon the jury. When an instruction has to be read and reread by a legally trained mind to catch a slight variation or error in its meaning, it is difficult to believe that a jury of laymen could have been misled.

*Keith v. Mendus*, 661 N.E.2d 26, 37 (Ind. Ct.App.1996), *trans. denied.* (citations omitted).

Here the trial court submitted 37 final instructions to the jury, 17 of which were related to Allison's EEL claims. As Northrop is unclear as to what result this instruction erroneously leads the jury, we find that Final Instruction 34, when read in conjunction with the 36 remaining instructions, was not defective.

3. *Prejudgment Interest*

Northrop argues that prejudgment interest awarded under California Civil Code § 3287(a) was improper because Allison's damages were not certain or capable of being made certain because Northrop contested the method of calculation.[16] In addition, Northrop argues that the trial court's award of prejudgment interest un-

---

16. In support of its position, Northrop returns to an underlying theme that Allison was awarded its "total costs" by urging that "total costs unreasonably incorporated expenses due to Allison mismanagement, inefficiencies, and unbudgeted-for but foreseeable problems."

(Northrop's Br. at 97). Northrop asserts that Allison was only entitled to the reasonable value of its extra work. As we have determined above, the instruction of which Northrop complained did not instruct the jury to award "total costs."

der California Civil Code § 3287(b) was improper because it failed to articulate its rationale.

In response, Allison argues that prejudgment interest under § 3287(a) is available even where Northrop disagrees with the cost of the work performed. Moreover, Allison argues that there was no disagreement as to the basis for calculating damages. For example, Allison asserts that Northrop never contested the accuracy of its accounting records. Concerning the trial court award under § 3287(b), Allison argues that this court need not address it if we find the award under § 3287(a) was properly imposed. Nevertheless, Allison asserts that the evidence supports the trial court's award.

California Civil Code § 3287(a) provides:

(a) Every person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day, except during such time as the debtor is prevented by law, or by the act of the creditor from paying the debt. This section is applicable to recovery of damages and interest from any such debtor, including the state or any county, city, city and county, municipal corporation, public district, public agency, or any political subdivision of the state.

Subdivision (b) provides:

(b) Every person who is entitled under any judgment to receive damages based upon a cause of action in contract where the claim was unliquidated, may also recover interest thereon from a date prior to the entry of judgment as the court may, in its discretion, fix, but in no event earlier than the date the action was filed.

The trial court's order on prejudgment interest reflects its consideration of both subdivisions of § 3287.[17] The court determined:

Based on the evidence presented at trial, *this Court finds that Allison's damages are certain or capable of being made certain by calculation* under California [Civil] Code § 3287(a) as of August 27, 1990 with regard to the EEL damages and as of December 5, 1990 with regard to the Trailing Edge damages, the dates on which Allison filed its claim for excess costs with Northrop.

(Northrop's App. p. 95) (emphasis added).

The trial court expressly rejected Northrop's argument that the damages were not certain or capable of being made certain because Northrop had contested Allison's method of calculating its damages. Specifically, the court stated:

Defendant's counterclaims and claims for offsets did not make Allison's damages uncertain or incapable of being made certain and the jury's award of damages established that once the jury decided the appropriate scope of liability and responsibility, the jury had the ability to calculate with precision the amount of plaintiff's damages on the basis of financial data admitted into evidence.

(Northrop's App. p. 95–96). The trial court then determined that the jury's entire damages award of $31,278,296 was

17. California Civil Code § 3287 is the general prejudgment interest statute and has been interpreted as applying to all claims. *See Levy-Zentner Co. v. Southern Pac. Transp. Co.*, (1977) 74 Cal.App.3d 762, 796, 142 Cal.Rptr. 1 (distinguishing California Civil Code § 3288 as applicable only to noncontractual obli-

gations as specified by the legislature). "[T]he distinction between the two subparts has to do with the nature of the damages—liquidated and unliquidated...." *Lewis C. Nelson & Sons v. Clovis Unified School District*, (2001) 90 Cal.App.4th 64, 71, 108 Cal. Rptr.2d 715.

subject to prejudgment interest under subsection (a), as of the dates Allison presented its EEL and TE claims to Northrop.

The trial court set out an alternative basis for an award of prejudgment interest pursuant to § 3287(b). The court also determined that the jury's entire damages award was subject to prejudgment interest under subsection (b), commencing on September 13, 1991 the date Allison filed this action in court.

The trial court calculated the prejudgment interest award alternatively under both subdivisions, (a) and (b). The court specified that pursuant to California Civil Code § 3289 the prescribed prejudgment interest rate of 10% per annum would result in a prejudgment interest award of $36,391,196.05 under subdivision (a), and a prejudgment interest award of $33,266,396.80 under subdivision (b). Ultimately, the trial court imposed prejudgment interest pursuant to subdivision (a), resulting in a total damages and prejudgment interest award of $67,669,492.05.

■■■■ Prejudgment interest *must* be awarded as a matter of right under subdivision (a); however, prejudgment interest awards are a matter of discretion under subdivision (b). *Lewis C. Nelson & Sons v. Clovis Unified School District,* (2001) 90 Cal.App.4th 64, 71, 108 Cal.Rptr.2d 715. Thus, the statute governing prejudgment interest mandates such an award where the amount of the claim can be determined by established market values or by computation. *Wisper Corp. N.V. v. Calif. Commerce Bank et al.,* (1996) 49 Cal.App.4th 948, 57 Cal.Rptr.2d 141. A defendant's denial of liability does not make damages uncertain for the purposes of § 3287. *Id.* at 958, 57 Cal.Rptr.2d 141. "[T]he policy underlying authorization of an award of prejudgment interest is to compensate the injured party to make that party whole for the accrual of wealth which could have

been produced during the period of loss." *Id.* at 960, 57 Cal.Rptr.2d 141 (quoting *Cassinos. v. Union Oil Co.,* (1993) 14 Cal. App.4th 1770, 1790, 18 Cal.Rptr.2d 574).

■■■■ "The test for recovery of prejudgment interest under section 3287, subdivision (a) is whether defendant (1) actually knows the amount of damages owed plaintiff, or (2) could have computed that amount from reasonably available information." *KGM Harvesting Co. v. Fresh Network,* (1995) 36 Cal.App.4th 376, 391, 42 Cal.Rptr.2d 286; *accord Wisper,* 49 Cal. App.4th at 960, 57 Cal.Rptr.2d 141. "If the defendant does not know or cannot readily compute the damages, the plaintiff must supply him with a statement and supporting data so that defendant can ascertain the damages." *Polster, Inc. v. Swing,* (1985) 164 Cal.App.3d 427, 435, 210 Cal.Rptr. 567.

Further, "[t]he cases indicate that where there is a large discrepancy between the amount of damages demanded in the complaint and the size of the eventual award, that fact militates against a finding of the certainty mandated by [Civil Code section 3287]." *Wisper,* 49 Cal.App.4th at 961, 57 Cal.Rptr.2d 141 (quoting *Polster,* 164 Cal. App.3d at 435, 210 Cal.Rptr. 567). "Conversely, where there is no significant disparity between the amount claimed in the complaint and the final judgment, this factor generally tends to show that damages were certain or capable of calculation." *Wisper,* 49 Cal.App.4th at 961, 57 Cal. Rptr.2d 141.

Here, the jury's damages award is not significantly disparate from the amount Allison claimed in its complaint. The evidence disclosed that Northrop had personnel in Allison's plant, and that Allison supplied Northrop with monthly statements and the available supporting data in order to allow Northrop to ascertain the amount

owed before Allison filed suit. Even before Allison filed its lawsuit, Northrop had sent a financial team to inspect and review Allison's financial records and found no unusual accounting practices or voiced any concerns about Allison's records.

Additionally, the trial court specifically referred to the "purposes and policies of § 3287," noting that "an award of prejudgment interest to the plaintiffs" would serve those purposes and policies. (Northrop's App. p. 96). As indicated above, one such policy is to make the damaged party whole by compensating that party for the loss of the accrual of wealth during the period when the damages were calculable.

Accordingly, we cannot say that the trial court erred by determining that "Allison's damages [were] certain or capable of being made certain by calculation under California Code § 3287(a) as of August 27, 1990 with regard to the EEL damages and as of December 5, 1990 with regard to the Trailing Edge damages, the dates on which Allison filed its respective claims for excess costs with Northrop." (Northrop's App. p. 95). After the trial court so determined, Allison was entitled to prejudgment interest pursuant to § 3287(a).

Inasmuch as the prejudgment interest award may be sustained under subdivision (a), we need not address the trial court's alternative determination under subdivision (b).

### Conclusion

Based on the foregoing, we find and conclude the following:

1. The trial court did not commit reversible error when it denied Northrop's motion for judgment on the evidence.
2. There was sufficient evidence presented to the jury and by a preponderance of that evidence, we find no reversible error in the jury's verdicts in favor of Allison on its superior knowledge claim, its defective specifications claim, and its claim for damages due to scope of work changes caused by Northrop's conduct.
3. There was sufficient evidence presented to the jury and by a preponderance of that evidence, we find no reversible error in the jury's verdict in favor of Allison on its claim for damages due to Northrop's failure to pay for the work Allison performed on the Trailing Edge project.
4. There was sufficient evidence presented to the jury and by a preponderance of that evidence, we find no reversible error in the jury's denial of Northrop's counterclaim for damages.
5. We find that pursuant to California Civil Code, Section 3287(a), the trial court did not commit reversible error by awarding Allison prejudgment interest.

Affirmed.

SULLIVAN, J., and RILEY, J., concur.